40186.    RAIF v. THE STATE.
40187.    LUCK v. THE STATE.

DECIDED FEBRUARY 25, 1964—REHEARING DENIED
MARCH 16, 1964.

E. W. Fleming, James E. Weldon, for plaintiffs in error.

Eugene Cook, Attorney General, Albert Sidney Johnson, Assistant Attorney General, Wright Lipford, Solicitor General, contra.

NICHOLS, Presiding Judge. 1. These cases were tried under the law enunciated in Winston v. State, 79 Ga. App. 711 (2a) (54 SE2d 354), and the cases there cited which held: "Although evidence against a defendant in a criminal case may be obtained by peace officers in the course of an unlawful, unwarranted, unreasonable, and reprehensible search of the home of the defendant, in a flagrant violation of the Fourth Amendment of the Federal Constitution and article 1, section 1, paragraph 16 of the Constitution of the State of Georgia, this does not affect the admissibility of the evidence thus obtained. Williams v. State, 100 Ga. 511 (1) (28 SE 624, 39 LRA 269)."

Judge Townsend, in that case, recognized the effect of such decisions and, speaking for himself and not for the court, said: "These decisions have had the effect of making but an empty shell of what was intended by the framers of these great guaranties of liberty to be the living seed of freedom. The Bills of Rights were ordained and established to protect the citizen against his public officers. A part of the first provision of the Constitution of the State of Georgia (article 1, section 1, paragraph 1) provides as follows: 'Public officers are the trustees and servants of the people, and at all times amenable to them.' The foregoing decisions of our Supreme Court, coupled with the law not in conflict therewith, say in effect to the peace officers of this State, 'You shall not make an unreasonable search and seizure of the home of a citizen, because his home is his castle. The breaking down of his door is a trespass for which you are responsible both civilly and criminally. An unlawful search

and seizure by you amounts to a violation of the most sacred rights given under our organic law. However, if you do make such a search, bring the evidence you thus obtained into a court of justice, and it will be given the same consideration as evidence honorably obtained.' "

At the time the *Winston* case and other similar cases were decided the decisions of the U. S. Supreme Court permitted each State to determine if such illegally obtained evidence was admissible in the courts of that State. See Wolf v. Colorado, 338 U. S. 25 (69 SC 1359, 93 LE 1782). And following such decisions this court in *Winston* and similar cases followed the decisions of the Supreme Court of Georgia. Since that time the U. S. Supreme Court has repudiated its decision in the Wolf case and in Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081) held that evidence obtained as a result of an illegal search and seizure is not admissible in either Federal or State courts. See also Fahy v. Connecticut, 375 U.S. 85 (84 SC 229, 11 LE2d 171). Thus, under such decision evidence obtained under an illegal arrest is not admissible in state courts. In Ker v. California, 374 U. S. 23 (83 SC 1623, 10 LE2d 726), it was decided that evidence obtained in connection with a legal arrest was admissible although obtained from the defendant's home without a search warrant and although the arrest was made without a warrant. The officer there had reasonable grounds to believe an offense was being committed and such case is of course distinguishable from the present case where there was no evidence that the defendants were violating any law or municipal ordinance at the time of the arrest, no evidence of flight, and no evidence to authorize the arresting officer to arrest the defendants because there was likely to be a failure of justice if the arrest was not made. See *Code* § 27-207. The arresting officers, according to the evidence, did not know of the particular crime having been committed and there was no evidence that such arrests were made because the officers had reasonable grounds to suspect that they had committed a felony. Mere suspicion that some crime, which would include a misdemeanor, may have been committed is insufficient to authorize an arrest without a warrant, and *Code Ann.* § 27-212 which requires that

when an arrest shall be made without a warrant the person making the arrest shall without delay convey the offender before the most convenient officer authorized to receive an affidavit and issue a warrant (and that no such imprisonment shall be legal beyond 48 hours), presupposes a legal arrest without a warrant and such Code section cannot be used as a basis for legitimatizing an otherwise illegal arrest. There is no authority in Georgia under which a citizen may be arrested without a warrant and held for investigation to determine if he has committed some crime merely because the person making the arrest has a suspicion that the person arrested may have committed some then unknown crime.

The arrests were illegal and if the evidence obtained after such illegal arrests from the defendants was not voluntarily given then, under the Mapp case, supra, such evidence being the fruits of an illegal search and seizure of the persons, was inadmissible. The police officers, who obtained such evidence, testified they merely asked the prisoners for the evidence and they gave it to them. It is contended that such evidence was freely and voluntarily furnished by the defendants and under such circumstances was admissible. In reply to this contention it is only necessary to refer to the language of Justice Lumpkin in *Chattahoochee Brick Co. v. Braswell*, 92 Ga. 631, 634 (18 SE 1015): "The plaintiff was a convict, and according to the evidence, his movements were absolutely controlled and directed by a guard, or 'boss,' whose orders he was compelled to obey. This guard had and exercised over him the most complete dominion and authority. The plaintiff's position, so far as the power of the guard was concerned, was more that of a slave than a mere servant, and it is apparent that he dared not disobey any of the guard's commands." A prisoner in police custody by reason of an illegal arrest is in no position to refuse to comply with the demands of the officer in whose custody he is placed whether such demand is couched in the language of a polite request or a direct order. If a command, the prisoner is directly forced to comply, and if a request, he is indirectly forced to comply.

As previously shown, the arrests were illegal, and the defend-

ants were directly or indirectly forced to furnish such evidence. Thus the question is presented as to whether the law exemplified in the holding in the *Winston* case, supra, following prior decisions of the Supreme Court of Georgia is binding upon this court or whether the interpretation placed on the Fourth, Fifth and Fourteenth Amendments of the U. S. Constitution by the Supreme Court of the United States in the Mapp case, supra, is controlling.

This court is bound by the decisions of the Supreme Court of Georgia (Constitution of 1945, Art. VI, Sec. II, Par. VIII; *Code Ann.* § 2-3708), and under the decision of the Supreme Court in *Watkins v. State,* 199 Ga. 81, 88 (33 SE2d 325), as to interpretation of the Constitution of the United States by the Supreme Court of the United States, the Supreme Court of Georgia is bound by such decisions, for as was there said: "In *Padelford v. Savannah,* 14 Ga. 438, may be found the statement that 'The Supreme Court of Georgia is co-equal and co-ordinate with the Supreme Court of the United States; and therefore the latter cannot give the former an order, or make for it a precedent.' Judge Benning's reasoning in that case is buttressed by many expressions from outstanding statesmen and jurists who flourished in the dawn of the republic, and is based on a concept that was common to leading men of all sections in the earlier days; yet, as time rolled on, the very stars in their courses seemed arrayed against the plan of the founding fathers. One is sometimes led to wonder if the States, once sovereign, have not become, from a practical standpoint, under the expanding powers of the Federal government, the exercise of which has been sanctioned by the Supreme Court of the United States under its interpretation of the powers delegated by the States, little more than geographical subdivisions of a consolidated government, with but a minimum of authority to regular their own internal affairs, and shorn of power to deal with their own domestic problems in their own way. Views similar to those uttered by the Georgia judge in *Padelford v. Savannah,* supra, were expressed by Chief Justice McKean of Pennsylvania in Respublica v. Cobbet, 3 Dallas, 467, and by the great Judge Spencer Roane of the Supreme Court of Appeals of Virginia in Hunter

v. Martin, 4 Munford (18 Va.) 1. Nor were such opinions foreign to the courts of Massachusetts, Ohio, Wisconsin, California, Missouri, and Illinois. Weatherbee v. Johnson, 14 Mass. 417; Johnson v. Gordon, 4 Cal. 368; In re Booth, 3 Wis. 1, 49; Knoup v. Piqua Branch of State Bank, 1 Ohio St. 603; Chadwick v. Moore, 8 Watts & Serg. (Pa.) 49 (42 AD 267). To recall how prevalent such statements were at one time in various sections of the country, as found in court decisions, resolutions of State legislators, and the deliverances of representatives and senators on the floor of the American Congress, one has but to acquaint himself with Warren's The Supreme Court in United States History. But such language as was contained in the Georgia case referred to above to-day sounds like a voice from the tomb. Indeed one who went to battle for four years, seeking to maintain the principle on which that pronouncement rests, observed with reference to that opinion as follows: 'The war killed that decision as it did the one in the Dred Scott case, and both are buried in the same grave.' Report of Georgia Bar Association (1909), pp. 132, 134. The writer referred, of course, to the controlling pronouncement in that decision which was that the Supreme Court of Georgia had the right to decide for itself whether or not a municipal ordinance, or an act of the General Assembly, was a violation of the Constitution of the United States, regardless of the interpretation placed thereon by the Federal Supreme Court. A similar thought to that contained in the words quoted was in the mind of Chief Justice Bleckley when, speaking for this court in *Wrought Iron Range Co. v. Johnson*, 84 Ga. 754 (11 SE 233, 8 LRA 273), he said: 'After the State has yielded to the Federal army, it can very well afford to yield to the Federal judiciary. . . The doctrine of co-equality and co-ordination between the Supreme Court of Georgia and the Supreme Court of the United States, so vigorously announced by Benning, J., in *Padelford v. Savannah*, 14 Ga. 439, regarded now from a practical standpoint, seems visionary. Its application to this, or any like case, would be a jarring discord in the harmony of law. Moreover, any attempt to apply it effectively would be no less vain than discordant. When we know with certainty that a question arising under the Constitu-

tion of the United States has been definitely decided by the Supreme Court of that government, it is our duty to accept the decision, for the time being, as correct, whether it coincides with our opinion or not. Any failure of due subordination on our part would be a breach, rather than the administration, of law.' It needs scarcely to be added that this court, when a question arises as to the construction of a portion of the Constitution of the United States, or a statute enacted in pursuance thereof, feels it to be its duty to follow, as binding precedents, the adjudications of the Supreme Court of the United States. *State v. Atlantic & Gulf Railroad Co.*, 60 Ga. 268; *Georgia Railroad v. Cubbedge*, 75 Ga. 321; *Murray v. Miller*, 157 Ga. 11 (121 SE 113); *Slicer v. State*, 168 Ga. 566 (148 SE 385)." Accordingly, the law as exemplified in the *Winston* case, supra, and similar cases decided by this court and the Supreme Court of Georgia is no longer the law and we are bound to follow the interpretation of the Supreme Court of the United States in the Mapp case, supra, as to the admissibility of evidence obtained by an illegal search and seizure resulting from an illegal arrest. See *Scott v. State*, 14 Ga. App. 806, supra, and *Pickett v. State*, 99 Ga. 12, 15 (25 SE 608, 59 ASR 226).

Therefore, the judgment overruling the special grounds of the amended motion for new trial which complained of the admission of evidence obtained from the defendants by an illegal search and seizure while they were under an illegal arrest must be reversed.

2. Other special grounds of the motion for new trial present questions which will probably, in view of the ruling in the first division of the opinion, not recur on another trial of the case and therefore will not be passed upon. In as much as the evidence may not be the same on another trial the usual grounds of the motion for new trial are not passed upon.

*Judgments reversed. Felton, C. J., Frankum, Hall, Eberhardt, Russell and Pannell, JJ., concur. Bell, P. J., and Jordan, J., dissent.*

JORDAN, Judge, dissenting. The opinion in this case is predicated on the theory that the defendants were illegally arrested and therefore any evidence obtained from them as an incident

of such arrest was inadmissible in the trial of the case, citing as authority the ruling of the Mapp case, 367 U.S. 643 (81 SC 1684, 6 LE2d 1081). The opinion deals with the decisions of the Supreme Court of the United States leading up to the decision in the Mapp case, properly concluding that both this court and the Supreme Court of Georgia are now bound by the general rule laid down in the Mapp case to the effect that evidence obtained by a search and seizure in violation of the Fourth Amendment to the United States Constitution is inadmissible in a State court as it is in a Federal court.

There have been numerous cases in this court since the Mapp decision (1961) in which appellants have sought application of its principles. General interest in the Mapp case would seem to justify an examination of its effect on criminal procedure in this State. Having stated the general rule which it laid down, let us now see what was not decided in the Mapp case.

The Supreme Court has set this forth very clearly in the later decision of Ker v. California, 374 U.S. 23, 31 (83 SC 1623, 10 LE2d 726), in which it held that the arrests made in that case without warrants were sufficiently grounded on probable cause, thus making the arrests legal and the evidence obtained incident thereto admissible. Both the Mapp opinion and the Ker opinion were written for the majority by Mr. Justice Clark, who in a discussion of the Mapp case said in the Ker case, "First, it must be recognized that the 'principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts . . . this court has . . . formulated rules of evidence to be applied in federal criminal prosecutions.' [citing cases]. Mapp, however, established no assumption by this Court of supervisory authority over state courts, . . . and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law . . . Second, Mapp did not attempt the impossible task of laying down a 'fixed formula' for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures; it recognized that we would

be 'met with "recurring questions of the reasonableness of searches" ' and that 'at any rate, "reasonableness is in the first instance for the [trial court] to determine," ' . . . thus indicating that the usual weight be given to the findings of trial courts." Justice Clark's opinion went on to say, "This Court's long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application is carried forward when that Amendment's proscriptions are enforced against the States through the Fourteenth Amendment. And, although the standard of reasonableness is the same under the Fourth and Fourteenth Amendments, the demands of our federal system compel us to distinguish between evidence held admissible because of our supervisory powers over federal courts and that held inadmissible because prohibited by the United States Constitution. We reiterate that the resonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees. As we have stated above and in other cases involving federal constitutional rights, findings of state courts are by no means insulated against examination here [citing cases]. While this Court does not sit as in nisi prius to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental,—i.e., constitutional—criteria established by this Court have been respected. The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain."

It is clear then that by the Mapp decision the Supreme Court did not pre-empt the rule-making power of the States in regard to arrests, searches and seizures, and it did not attempt (nor could it have) to lay down a fixed formula by which standards of reasonableness could be measured, leaving that question to be determined in the first instance by the trial court from the facts and circumstances in each particular case.

In this case the trial court, by its rulings made during the progress of the trial and the subsequent denial of the motion for new trial, has determined that the actions of the officers in this case did not violate the rights of the defendants relative to illegal arrest, search and seizure and that the evidence obtained from them incident to the arrest was therefore admissible against them. In order for this court to examine this finding by the trial court, we must set forth fully the facts leading up to and immediately following the arrest as brought out on the trial of the case.

At some time during the night of Saturday, November 18, 1961, a store in a shopping center in Newnan was burglarized, the safe looted of some $3,000 which was later found in a trash can covered with a pile of leaves approximately 225 feet south of the shopping center. Subsequent investigation showed forcible entry through the rear door, a hole blown in the safe and elaborate equipment found on the premises, including acetylene torches, an oxygen tank, a drill, a piece of canvas, two walkie talkie radios, and other burglary tools. That such burglary had taken place was not known by the officers at the time the defendants were arrested. On Sunday, November 19th, at approximately 6:45 a.m. a witness for the State observed "an automobile which I did not recognize" containing three occupants at a red light near his home about two blocks from the shopping center. This witness later identified one of the defendants as the driver of this car. Upon his return to his home about 9 a.m. this witness noticed this car parked on the street in front of his house with no one in it. He called the city police and the car was removed.

At approximately 8:30 a.m. police officer Morris while cruising the area near the shopping center observed a man (later

identified as a co-defendant named Smith) on the west side of Greenville Street directly across from the shopping center. Checking this area some ten to fifteen minutes later he noticed this man had moved across the street to a spot approximately ten or fifteen feet from the corner of the shopping center near a large boxwood tree. At approximately 10:25 a.m. Officer Morris with Officer Allen spotted two men then unknown to them, later identified as the two defendants herein, on Turner Street at a railroad crossing approximately 400-500 yards south of the shopping center. The defendant Raif was wearing greenish coveralls and brown shoes. The defendant Luck had on a blue sport coat, gray pants and black shoes. They were walking toward the shopping center. The officers observed that their shoes were wet and that the clothing on the left arm of each man was wet almost to the shoulder. (Evidence at the trial showed the hole in the safe to be large enough for a man's arm to enter and that the safe had been filled with water to prevent burning of the money by the blow torch operation.) The men were then placed in custody and taken to the police station where they were questioned by the police chief.

Keeping in mind that up to this point the police did not know of the burglary which had been committed and for which the defendants were subsequently convicted, did the officers have authority to take the defendants into custody under the provisions of *Code* § 27-207? If so, the arrest without a warrant being based on probable cause was legal and the evidence voluntarily obtained from them as an incident to their arrest was admissible on the trial of the case.

*Code* § 27-207 provides that, "An arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." *Code* § 27-211 provides that, "A private person may arrest an offender, if the offense is committed in his presence or within his immediate knowledge; and if the offense is a felony, and the offender is escaping, or attempting to escape, a private person may arrest him upon reasonable and probable grounds of suspicion."

In construing these Code sections this court has said, "We think that the words, 'in his presence,' as used in The Penal Code (1910) § 917 [*Code* § 27-207] and the words 'within his immediate knowledge' as used in § 921 [*Code* § 27-211] are synonymous. To justify the arrest without warrant, the officer need not see the act which constitutes the crime take place, if by any of his senses he has personal knowledge of its commission." *Piedmont Hotel Co. v. Henderson,* 9 Ga. App. 672, 681 (72 SE 51). "A crime is committed in the presence of an officer, if he sees it committed, or by the exercise of any of his senses he has knowledge, together with what he sees, that a crime is being committed by the person sought to be arrested." *Howell v. State,* 162 Ga. 14 (6c) (134 SE 59); *Phelps v. State,* 106 Ga. App. 132 (126 SE2d 429).

The officers making the arrest in this case had observed a series of events in the neighborhood of a shopping center area which they were patrolling that could and should lead them to the reasonable conclusion that a crime was being perpetrated, committed or concluded in their presence and within their knowledge. Beginning at 8:30 a.m. on a Sunday morning they had observed a stranger standing on one side of a street across from the shopping center and who some fifteen minutes later had moved across the street nearer the shopping center to a spot covered by a large boxwood plant. (A walkie talkie radio with its switch "On" was found later in the day concealed in this plant.) Around 9:00 a.m. a report was made to police headquarters of a strange abandoned car just two blocks from the shopping center, which car was pulled in for checking. Some hour and a half later the arresting officers observed two other strangers (the defendants) at a railroad crossing just south of the shopping center, and observing the nature of their clothing and the fact that both left arms were wet almost to their shoulders, brought them to their chief for questioning. As a matter of human experience we know that strangers seen in a small city are viewed with a higher degree of curiosity and suspicion than they might be in a large metropolitan area, especially so in view of their continued presence near the railroad tracks and a shopping center on a Sunday morning. Based on their obser-

vations and knowledge and the exercise of their senses one could almost conclude that the officers would have been derelict in their duty to have failed to take the action which they did.

That the officers had probable cause for taking this action is borne out by the fact that within an hour or two after the defendants' arrest, a burglary was discovered at this shopping center. Further bearing out the officers' conclusion of the suspicious nature of the events and circumstances surrounding these defendants are the statements of the defendants themselves. In these statements the defendants, while denying knowledge of the burglary, admitted they were engaged in a crime at the time of their arrest in that they had helped a man run some whiskey that night and that they got their clothes wet from dew on the shrubbery while packing the whiskey and that they were then waiting by the railroad tracks for the man to come back to show them where to put the whiskey. So even under the defendants' explanation of the circumstances surrounding their presence at this location, the officers would have been justified in reaching the conclusion that a crime was being committed at that very time in their presence. Can they now claim their arrest to be illegal simply because the officers did not know the exact nature of the crime then being committed? Such being the facts surrounding the apprehension of these defendants, it is my conclusion that the arrest was legal and not an illegal one as set forth in the majority opinion.

Assuming then that the arrest was legal, was the subsequent action of the officers which produced evidence used against the defendants on the trial lawful as incident to those arrests? During the interrogation at police headquarters just after their detention, the defendant Luck gave his name as John Rogers, then admitted this to be incorrect. The defendant Raif, questioned separately, stated that he did not know Luck and had just met him on the railroad tracks. When asked if he had any identification he replied affirmatively and reached and got his wallet from his pocket. The police chief looked inside and found a new Reese key number 802 in the billfold with a driver's license. This key was later identified as being the type that would unlock a lock found on the back door of the Woolworth

store which had been burglarized. A deputy sheriff testified that later in the day (and after the burglary was discovered) he requested the two defendants to remove their clothing so it could be checked. He testified that they did not object to this and that "if they hadn't taken them off, I would had left them on." He said he gave them coveralls to wear after they had removed their clothing. There was testimony that this clothing contained burned metal and slag balls resulting from a torch burning operation, small pieces of glitter, and particles of safe insulation. The clothing and testimony relating thereto were admitted in evidence over the defendants' objections.

This question has been answered by our Supreme Court. "This court has repeatedly held that, where the accused after arrest does an act, without objection, which tends to incriminate himself, it is not error to allow testimony respecting the act, nor is evidence of the act violative of any constitutional right of the accused." *Thomas v. State,* 213 Ga. 237 (2) (98 SE2d 548), citing *Franklin v. State,* 69 Ga. 36 (3) (47 AR 748), and other cases. See also *Whippler v. State,* 218 Ga. 198 (126 SE2d 744).

Considering all the facts and circumstances of this case, it is my conclusion that the broad principles laid down in the Mapp case have not been violated, this case on its facts being closer to the situation in the Ker case where the Supreme Court held that the arrests without warrants were based on reasonable and probable cause, making the evidence obtained in the resulting search admissible in the trial of the defendants.

While the safeguards under the Fourth Amendment to the United States Constitution and Paragraphs 6 and 16 of our own Constitution are the very essence of constitutional liberty, we cannot be unaware of the "practical demands of effective criminal investigation and law enforcement."

I think the trial court did not err in finding the arrests to be legal and the evidence to be admissible.

I am authorized to say that Presiding Judge Bell joins in this dissent.