## 54893. RADOWICK v. THE STATE.
## 54894. LADD v. THE STATE.

QUILLIAN, Presiding Judge.

On the morning of May 23, 1977, Officer Daniels of the Cobb County Police Department, received a telephone call from an unknown individual. This call was routinely taped. The anonymous caller reported: ". . .a suspect load of marijuana on a maroon, four-wheel drive Chevrolet truck with a camper body on it. License plate KWA 642, Virginia license plate. . .The camper door came open and it was, uh, burlap bags packed in suspect-looking, you know. It was headed north on Roberts Road, at the Wade-Green Interchange and the back door came open and it was almost about to fall out, and they was real nervous, the two fellows were. . . he should be in Bartow County by now." The caller did not give his name and the police did not question him. Immediately thereafter Officer Daniels sent a teletype message to the Georgia State Patrol Barracks in Cartersville, which read: "Be on the lookout for a late model maroon Chev. PU. TK. 4-wheel drive, with camper on the back. Bearing VA. Lic. KWA-642. The vehicle should be traveling North-bound on US 41. Should be in your County at this time. Poss. loaded down with marijuana. Any contact hold and notify this station."

Georgia State Trooper Moore received the message and drove south until he contacted the described vehicle. He followed it for "about a mile and a half." He noticed nothing unusual. The driver committed no traffic violations in Trooper Moore's presence. The teletype message from the Cobb County Police was the sole reason he stopped the defendant's vehicle. Defendant Radowick was driving and defendant Ladd was in the passenger's seat. The driver was "completely calm" but the passenger was "more nervous," "fidgety." Trooper Moore asked Radowick for his driver's license and the passenger for identification. He received and kept both of their driver's licenses. He asked: "Would you mind stepping back to the back of the . . . truck, and they did. . ." He explained that he had received a message and "had stopped them for suspicion of transporting contraband...[and] asked them

if they would give [him] permission to search their vehicle." Neither defendant said "yes" or "no."

Trooper Moore testified: "I told them at the time while we were standing out there that if they did not give me consent to search the vehicle, if I couldn't search it with their permission, then I would have to go down and get a judicial officer to issue a search warrant for me to search the vehicle, that the vehicle would be searched before we let them go." He "suggested" they get in the patrol car. He denied that he ordered them into the patrol car, because "when [he] asked them about the consent search he appeared to me to be somewhat reluctant." Moore radioed for another unit.

Two policemen arrived shortly thereafter. Trooper Moore advised them of the situation and the message he had received, but they did not have a "consent search form." Then they called the local detective unit. Mr. Sullivan, a detective with the Bartow County Sheriff's Office, estimated it took them "about fifteen minutes" to reach the scene. The defendants "were in the back seat of the trooper's car. I just took it for granted they were being held for us." Mr. Sullivan was advised by Trooper Moore about the "truck was supposedly loaded with marijuana." Mr. Sullivan took the driver's licenses from Trooper Moore, advised the defendants of their Miranda rights, and they also were "advised of their rights" as to a "consent search." Defendant Radowick stated: "we were probably going to search it there — that we might as well search it there, because we were going to search it downtown anyway."

After the consent to search form was secured, the detectives approached the back door of the pickup truck. One detective stated that he smelled marijuana. The other detective "sniffed around the door" and agreed that it was marijuana. The rear door was secured by two screws and nailed shut. After it was pried open, 74 bales of marijuana were found inside. Defendants appeal their conviction. *Held:*

1. The first issue to be resolved is whether the police were authorized to stop the defendants' vehicle. The United States Supreme Court, in Carroll v. United States, 267 U. S. 132 (45 SC 280, 69 LE 543) and Brinegar v.

United States, 338 U. S. 160, 177 (69 SC 1302, 93 LE 1879), specifically upheld an individual's "freedom to use public highways in swiftly moving vehicles for dealing in contraband, and to be unmolested by investigation and search in those movements. In such a case the citizen who has given no good cause for believing he is engaged in that sort of [criminal] activity is entitled to proceed on his way without interference." 338 U. S. 160, p. 176.

Carroll and Brinegar antedated Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889), the progenitor of the doctrine that a police officer may make "an intrusion short of arrest" where he has "specific and articulable facts" which reasonably warrant such intrusion. Thus, the individual's "freedom to use public highways" is circumscribed by the state's police power when the officer has "specific and articulable facts" which warrant a stop of a vehicle to investigate the circumstances which provoke a reasonable and founded suspicion. United States v. Brignoni-Ponce, 422 U. S. 873, 878 (95 SC 2574, 45 LE2d 607).

This court has held that "articulable suspicion" is "less than probable cause to make an arrest or conduct a search, but must be more than mere caprice or arbitrary harassment." *Allen v. State,* 140 Ga. App. 828, 830 (232 SE2d 250). The United States Supreme Court, in Adams v. Williams, 407 U. S. 143 (92 SC 1921, 32 LE2d 612), held that a policeman was justified in stopping an individual on a "tip" that he would be carrying a gun and that Terry recognized that the Fourth Amendment did not require a police officer who lacked the precise level of information necessary for probable cause to arrest an individual, to simply shrug his shoulders, walk away, and permit the crime to occur or the criminal to escape. On the contrary, Terry recognized it could be the essence of good law enforcement practice to adopt an intermediate response by a *"brief stop"* of the suspicious person "to maintain the status quo *momentarily,* while obtaining more information" to confirm or dispel the information received. 407 U. S. 143, p. 146. (Emphasis supplied.)

In Brignoni-Ponce, the court explained that such "limited searches and seizures. . .were a valid method of

protecting the public and preventing crime...[and] because of the importance of the governmental interest at stake, the *minimal intrusion of a brief stop,* and the absence of practical alternatives" that when a police officer's information leads him to reasonably suspect a violation of the law "he may *stop the car briefly* and investigate the circumstances that provoke suspicion." 422 U. S. 873, p. 881. (Emphasis supplied.) We find there was a "founded suspicion" based on "articulable facts." The stop was authorized.

2. The second threshold reached is, if the stop was legal, was the subsequent search legal? The state contends the search was authorized on two grounds: (1) probable cause, and (2) consent. We will deal with the issue of probable cause first.

An automobile in which contraband is concealed and transported may be searched without a warrant if police have probable cause for believing the automobile to be searched contains the contraband. *Gondor v. State,* 129 Ga. App. 665 (1) (200 SE2d 477). The search without a warrant is permitted where it is impractical to obtain one because of the automobile's potential for instant mobility. Chambers v. Maroney, 399 U. S. 42 (90 SC 1975, 26 LE2d 419). Thus, Georgia has less stringent requirements for a warrantless search of an automobile than a permanent dwelling. *Underhill v. State,* 129 Ga. App. 65, 68 (198 SE2d 703). However, the fact that it is an automobile is not talismanic. The right to search and the validity of the seizure are dependent "on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." Carroll v. United States, 267 U. S. 132, 158, supra.

Here the basis for the stop and establishment of probable cause to search was information from an unknown informant. The United States Supreme Court has held where the impetus for the search originates with an informant, the police officials should be informed (1) of some of the underlying circumstances from which the informant concludes that contraband is where he claims it is, and (2) some of the underlying circumstances from which the officer concludes the informant, whose identity need not be disclosed, is credible or his information is

reliable. Aguilar v. Texas, 378 U. S. 108 (84 SC 1509, 12 LE2d 723).

The officer receiving the call from the unknown informant was given the circumstances which demonstrated why he knew the suspected contraband was where he said it was. But, was the second prong of Aguilar established? We hold that it was not. The detailed information of the description of the camper was verified by observation of the state trooper, but this is merely corroboration of "innocent activity and data" which is "unilluminating" as to any criminal activity. Spinelli v. United States, 393 U. S. 410 (89 SC 584, 21 LE2d 637). An unknown informant's tip, even when corroborated by innocent data of the suspect is insufficient to raise suspicion to the level of probable cause.

In a similar case, United States v. Ramos-Zaragosa, 516 F2d 141 (3) (9th Cir. 1975), where an unknown informant telephoned the police that a late model green Ford station wagon or pickup truck with a white, homemade wooden shell camper, with California license plates, was transporting heroin, and federal officials located the truck and arrested the defendants, the court held this was "not based on probable cause." Further, they stated that suspicious movements of the passengers "prior to completion of the arrest" were not sufficient to amount to probable cause for arrest.

In another similar case, Whiteley v. Warden, 401 U. S. 560 (91 SC 1031, 28 LE2d 306), a sheriff, acting on a "tip," caused a warrant to issue for the defendant and a companion. He issued a radio bulletin with the description of the defendant and the car he was driving. The Supreme Court held as the information given the magistrate was insufficient for the warrant to issue, the standard for the arresting officer was no less stringent. If additional information had been acquired by the arresting official prior to the arrest which was "corroborative of the informer's tip that the arrestees committed the felony" it could have been sufficient to establish probable cause. 401 U. S. p. 567. In the instant case the state points to the fact that the two detectives detected the odor of marijuana prior to opening the door. This theory falls for two reasons: (1) the illegal arrest had

already been consummated, and (2) the detectives were at that time executing the "consent" search document obtained from the defendant. We find an absence of probable cause to arrest or search.

3. The third threshold to be crossed is the issue of whether the justifiable "Terry-type" stop in this instance was converted into an arrest by the subsequent actions of the police. The Constitution does not forbid all searches and seizures, only those that are unreasonable. Rios v. United States, 364 U. S. 253 (80 SC 1431, 4 LE2d 1688). Terry held that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U. S. 1, p. 16. Although the original "seizure" in the instant case was "an intrusion short of arrest" (Terry v. Ohio, 392 U. S. 1, 5, (f), supra), did the subsequent actions of the police overreach the minimal intrusion authorized and convert the legal stop into an illegal arrest? We find that they did.

We have determined that the police officers had an "articulable" and "founded" suspicion that the defendants possessed contraband by reason of the explicit and detailed information provided by the unknown informant which was verified in part by observation of the police officer. Thus, the policeman was authorized to make a reasonable "Terry-type" stop to obtain "more information" (Adams v. Williams, 407 U. S. 143, p. 146, supra) and "investigate the circumstances that provok[ed] suspicion." United States v. Brignoni-Ponce, 422 U. S. 873, p. 881, supra.

Our research revealed that opinions dealing with "Terry-type" stops always spoke in terms of: "a brief stop" (United States v. Brignoni-Ponce, 422 U. S. 873, p. 881, supra); "A brief stop of a suspicious individual . . . to maintain the status quo momentarily . . ." (Adams v. Williams, 407 U. S. 143, p. 146, supra); "confined his search strictly to what was minimally necessary" (Terry v. Ohio, p. 30, supra); "momentarily detain" (*Anderson v. State,* 123 Ga. App. 57 (2) (179 SE2d 286)); "momentary detention" (*Brooks v. State,* 129 Ga. App. 109 (198 SE2d 892)); "a limited protective search" (*Nix v. State,* 138 Ga. App. 122, 123 (225 SE2d 714)); "A brief stop of a suspicious individual" (*Allen v. State,* 140 Ga. App. 828, 831, supra);

"momentary inconvenience" — "limited investigative inquiry" (*Brisbane v. State,* 233 Ga. 339, 343, 344 (211 SE2d 294)); "limited questioning" (United States v. Bonds, 422 F2d 660 (8th Cir. 1970)).

A composite picture emerges of the "Terry-type" stop. It is a brief stop, limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification, licensing of a driver and a vehicle if appropriate, a protective "pat-down" of the outer surface of clothing for weapons if the officer has reasonable apprehension that the person is armed or dangerous, and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop.[1] See United States v. Brignoni-Ponce, 422 U. S. 873, supra; Terry v. Ohio, 392 U. S. 1, supra; Warden v. Hayden, 387 U. S. 294, 310 (87 SC 1642, 18 LE2d 782); *Holtzendorf v. State,* 125 Ga. App. 747 (188 SE2d 879); *Brisbane v. State,* 233 Ga. 339, 343-344, supra.

The Supreme Court held in Terry that the Fourth Amendment applies to the "stop and frisk" procedure it authorized even though it was a seizure not culminating in a traditional arrest. 392 U. S. 1 (4), supra. Further, the limited protective "pat-down" for weapons was a "search." And they must have sensed there would be police officers who would attempt unreasonably to stretch the limited nature of the "minimal intrusion" authorized, for they added: "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope . . . [t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." 392 U. S. 1, p.

---

[1] Acts authorized by, or limitations of a "Terry-type" stop (a noncustodial investigative stop; *Shy v. State,* 234 Ga. 816, 819 (218 SE2d 599)), should not be confused with acts authorized by "lawful custodial arrest" following lawful apprehension for traffic violations, set forth in United States v. Robinson, 414 U. S. 218 (94 SC 467, 38 LE2d 427) and Gustafson v. Florida, 414 U. S. 260 (94 SC 488, 38 LE2d 456).

18, supra. "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrest' or 'investigatory detentions.'" Davis v. Mississippi, 394 U. S. 721, 726 (89 SC 1394, 22 LE2d 676).

Along the same vein, both our appellate courts have held that police may not delay the arrest of a suspect or use a "Terry-type" stop rationale as a subterfuge to coerce a suspect into consenting to a search. State v. Handspike, 142 Ga. App. 104, 107 (235 SE2d 568), revd. other grounds, 240 Ga. 176; Shy v. State, 234 Ga. 816, supra, 821-822. Thus, it is evident that after the "brief stop" authorized by Terry, absent additional corroborative evidence of the criminality asserted in the original information, the authorized "momentary detention" is transformed into "unauthorized detention" by reason of the "intolerable intensity" of the investigative seizure, and an illegal arrest comes into being. This mutation point can be determined only by the totality of the surrounding circumstances in each individual case. Cf. Terry v. Ohio, 392 U. S. p. 21, supra.

In the instant case Trooper Moore testified that his record showed he stopped the defendants' vehicle at "9:50" a.m. Detective Sullivan testified that his recorded time of arrival was "10:30" a.m. Was this time interval, and the concomitant acts of the police, sufficient to convert the authorized stop into an illegal arrest? We find that it was.

Our Supreme Court has ruled that "[a]n arrest is accomplished whenever the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be." Clements v. State, 226 Ga. 66, 67 (172 SE2d 600); Strong v. State, 231 Ga. 514, 518 (202 SE2d 428); Davidson v. State, 125 Ga. App. 502, 503 (188 SE2d 124); Holtzendorf v. State, 125 Ga. App. 747, supra, 750-751; Brooks v. State, 129 Ga. App. 109, supra, 110; Caito v. State, 130 Ga. App. 831 (1) (204 SE2d 765); Flournoy v. State, 131 Ga. App. 171 (2) (205 SE2d 473); Hill v. State, 140 Ga. App. 121, 124 (230 SE2d 336). Although it is obvious that every arrest includes detention, not every detention is an arrest — as Terry, Adams, and Brignoni-Ponce, supra, held. But here, where

detention exceeded 40 minutes, it tortures the English language to say it was a "brief" stop or "momentary detention." Neither did it involve only a "minimal intrusion." Terry authorizes only an "intrusion short of arrest," and specifically held that it is a search, " a serious intrusion upon the sanctity of the person. . . and is not to be undertaken lightly." 393 U. S. 1, 17, supra.

Trooper Moore admitted that the stop was made for "the singular purpose of effectuating a search of that vehicle" and he intended to hold them until the vehicle was searched, and if they had attempted to leave he would have attempted to stop them. They were not free to go on their way." He placed the defendants in his vehicle, kept their driver's licenses in his custody, and held defendants for "investigation."

We find the detention period exceeded the "brief stop" authorized by Terry and Brignoni-Ponce to investigate the basis for the stop, and amounted to an illegal arrest as it was not based on reasonable or probable cause. See *Hill v. State,* 140 Ga. App. 121, 124 (1), supra; Bowling v. United States, 350 F2d 1002 (1) (DC Cir. 1965).

4. The state contends the search of the defendants' vehicle was authorized by consent of the defendant Radowick. A search conducted pursuant to consent is wholly valid. Davis v. United States, 328 U. S. 582, 583 (66 SC 1256, 90 LE 1453). Normally we would rely upon the decision of the fact finder to determine the issue of consent, and if there was any evidence to support that finding the appellate court would not reverse such finding. See *Code v. State,* 234 Ga. 90, 95 (214 SE2d 873). However, in this instance the court found there was probable cause for a search and did not consider the issue of legality of the detention, previously determined herein adversely to the state.

The mere fact that an individual is in custody or under arrest, without more, is not enough to establish consent was involuntary. Davis v. United States, 328 U. S. 582, supra. But "[a] prosecutor who seeks to rely upon consent to justify the lawfulness of a search has the burden of proving that the consent was, in fact, freely and voluntarily given, and this burden cannot be discharged by showing no more than acquiescence to a claim of lawful

authority." Bumper v. North Carolina, 391 U. S. 543 (7) (88 SC 1788, 20 LE2d 797). "This burden on the Government is particularly heavy in cases where the individual is under arrest." Judd v. United States. 190 F2d 649, 651 (DC Cir. 1951); United States v. Burke, 215 FSupp. 508 (DC Mass 1963); affd. (CA 1) 328 F2d 399; cert. den. 379 U. S. 849; see also 9 ALR3d 876, § 6 (b) and cits. The ultimate test remains, "[i]s the [consent to search] the product of an essentially free and unrestrained choice by its maker? . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of [the product of the search] offends due process." Schneckloth v. Bustamonte, 412 U. S. 218, 225 (93 SC 2041, 36 LE2d 854). In determining whether consent to search was coerced, by explicit or implicit means, this court will consider not only overt acts but subtle police statements or questions which tend to impact adversely on the subject's "will," as well as the vulnerable state of the individual detained, in custody, or under arrest, and particularly those illegally arrested or detained. See *Holtzendorf v. State,* 125 Ga. App. 747 p. 751, supra; *Hill v. State,* 140 Ga. App. 121 (2) (230 SE2d 336).

"A consent which is the product of coercion or deceit on the part of the police is invalid. [Cits.] Thus, close judicial scrutiny of an alleged consent to search is necessary. This is particularly true under the circumstances of this case because it is difficult to imagine why an accused . . . would voluntarily permit officers to conduct a search of his premises if he knows that incriminating evidence will be found." *Code v. State,* 234 Ga. 90, p. 93, supra." 'Where consent to a search follows an illegal arrest or detention, some courts take the view that the consent is necessarily invalid, while others hold that although there is a heavy burden on the prosecution to prove an absence of duress, a valid consent may be found' . . . [A]n apparent lack of protest . . . is not adequate . . . to carry the state's burden which is particularly strong in cases of illegal custody." *Ivins v. State,* 129 Ga. App. 865, 868 (201 SE2d 683).

"Voluntariness is a question of fact to be determined from all the circumstances . . ." Schneckloth v. Bustamonte, 412 U. S. 218, 248, supra. And, as stated

earlier, consent which is the product of coercion or deceit on the part of police is invalid. *Code v. State,* 234 Ga. p. 93, supra. "There can be no consent to a search where there is coercion, albeit colorably lawful coercion, as where a law enforcement officer claims authority to search a home under a warrant, thereby announcing in effect that the occupant has no right to resist the search." Bumper v. North Carolina, 391 U. S. 543 (20 LE2d 797 (9)), supra. This state follows the same rule. "It is true that where deceit is used to obtain consent, e.g., when an officer represents to an accused that he has authority to search, when actually he does not, a resultant consent by the accused to the search is invalid. In these circumstances, the consent is merely a submission to an apparent legitimate display of legal authority to which all are required to submit." *Code v. State,* 234 Ga. 90 at 95, supra.

In the instant case the arresting officer testified that he told the defendants: "if I couldn't search it with their permission, then I would have to go down and get a judicial officer to issue a search warrant for me to search the vehicle, that the vehicle would be searched before we let them go." We have previously held that this officer had insufficient evidence to establish probable cause and there was no valid basis for issuance of a search warrant. We consider it important that no effort was ever made to secure a search warrant. See *Shy v. State,* 234 Ga. 816, p. 821, supra. Rather, all of the officer's efforts were directed to inducing consent of the defendants to the search. The first officer was unable to secure consent. It is not clear what the second and third officers did after they arrived as the state trooper was asked if either talked to the defendants, and he testified: "I don't know whether he did or not." The consent form was later obtained by the fourth and fifth officers who arrived more than 40 minutes after the original stop.

This court has also observed that " '[a] prisoner in police custody by reason of an illegal arrest [or any other form of detention, overt or subtle] is in no position to refuse to comply with the demands of the officer in whose custody he is placed whether such demand is couched in the language of a polite request or a direct order. If a command, the prisoner is directly forced to comply, and if

a request, he is indirectly forced to comply.' " *Holtzendorf v. State,* 125 Ga. App. 747, 751, supra. Accord, *Raif v. State,* 109 Ga. App. 354, 358 (136 SE2d 169); *Hill v. State,* 140 Ga. App. 121, supra, 124.

The reason for the consent was given by the defendant, as part of the res gestae: "we might as well search it there, because we were going to search it downtown anyway." To this court, this indicates the person's will was overcome by the coercive actions of the police: (1) the police did not have probable cause to search or arrest, but detained the defendants an inordinate period of time, (2) the defendants were advised that they could consent or a search warrant would be obtained to authorize the search, (3) the defendants were advised "the vehicle would be searched before we let them go," (4) no attempt was made to secure a search warrant, but all police effort was directed toward procuring consent of the defendants, (5) the purported consent was obtained while under illegal arrest, (6) although the period of time was not extensive, it was sufficient to convince defendants that Trooper Moore was doing what he said he would do: "the vehicle would be searched before [he] let them go," and (7) the res gestae statement of the defendant signified he was resigned to a fate decreed by his illegal detention — as opposed to freely, voluntarily given consent. The state has not borne its heavy burden of proving consent was voluntary where the defendant was illegally arrested. *Ivins v. State,* 129 Ga. App. 865, 868, supra.

If the exclusionary rule invoked here for suppression of evidence is to act as a deterrent to illegal law enforcement practices (Brown v. Illinois, 422 U. S. 590 (1) (95 SC 2254, 45 LE2d 416)), it must be applied to the factual predicate of the instant case or the converse rule will emerge. That is, if illegal detention for an extended period of time, without prior probable cause, is not sufficient to exclude evidence obtained thereby, then police officers have been judicially licensed to illegally detain suspects, without probable cause, for extended periods of time, until the will of the suspect succumbs to the coercive effect of illegal police action. This court can not countenance illegal acts even though they achieve desired civic solutions.

*Judgment reversed. Shulman, J., concurs. Banke, J., concurs specially.*

ARGUED NOVEMBER 9, 1977 — DECIDED FEBRUARY 14, 1978 — REHEARING DENIED MARCH 10, 1978 — CERT. APPLIED FOR.

*Cook & Palmour, Bobby Lee Cook, Jr., Archer, Elsey & Vaughan, William T. Elsey, John Roger Sherry,* for appellants.

*Charles Crawford, District Attorney, Kirby G. Atkinson, Assistant Attorney General,* for appellee.

BANKE, Judge, concurring specially.

I cannot agree with everything stated in the opinion, but do concur in the judgment. The "Terry-type" stop was fully authorized, but the record indicates the stop apparently was made prematurely. The investigative forces summoned had no advance notice and seemingly were ill prepared to conduct an investigation that would produce sustainable probable cause within the short detention period authorized by Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) and its progeny. Further, probable cause existed; but unfortunately it was not determined until after arrest and consent. It cannot be ascertained from the record as to the exact number of minutes that elapsed between stop and arrest. It can be determined, however, that it was in excess of 40 minutes. In the circumstances of this particular case, that was far too long. The temporary detention was slowly transformed into an illegal arrest.