## 64077. THE STATE v. SMITH.

POPE, Judge.

On June 11, 1981, in an attempt to identify domestic drug couriers, Senior Agent Paul J. Markonni of the Atlanta Airport Detail of the Drug Enforcement Administration ("DEA") was routinely observing passengers deplane from a commercial flight arriving at the Atlanta International Airport from Fort Lauderdale, Florida, a major source city for the importation and distribution of illegal drugs. Agent Markonni's attention was attracted to deplaning passenger Paul M. Smith because Smith "appeared to be looking around and staring at people in the arrival area" so much so that he "bumped into a couple of passengers and had to excuse himself." His suspicion aroused, Agent Markonni followed Smith to the gate area of his connecting flight to Tulsa, Oklahoma. Smith sat down within the gate area until the ticket agent returned, whereupon Smith checked in for his flight to Tulsa. Agent Markonni then obtained from the ticket agent Smith's surrendered ticket from which he learned Smith's name, destination, and that the ticket had been paid for by credit

card. From information gained from Smith's reservation record obtained with the help of an airline employee, and from a subsequent telephone call to the Fort Lauderdale hotel listed as Smith's call-back number, Agent Markonni surmised that Smith was not a Florida resident and that he had made his airline reservation to Tulsa the morning of the flight. Based upon Smith's hotel check-in time, the agent speculated that Smith had spent approximately nineteen hours in Fort Lauderdale, most of them nighttime hours.

Dressed in casual clothes and carrying a concealed weapon, Agent Markonni approached Smith who was still seated within the gate area. Two other out-of-uniform officers armed with concealed weapons took positions designed to be nearby, yet not so close as to be noticed by Smith. Taking the seat beside Smith, Agent Markonni identified himself as a federal officer and asked to speak with him. Upon Agent Markonni's request, Smith produced his ticket, driver's license and his name. Both the ticket and license were in Smith's name. In response to the agent's questioning regarding the purpose of his trip, Smith stated that he had gone there to look at an airplane. As the interview proceeded, Smith appeared to be increasingly nervous. Agent Markonni then told Smith that he was a narcotics officer and began to question Smith as to whether he was carrying contraband drugs, either on his person or in his luggage. When Smith responded negatively, Agent Markonni asked to conduct a search of his person, specifically his boots. Smith raised his trousers and allowed the agent to look into the boots, wherein a bulge was discovered. This, according to Smith, was cash in the amount of "a few thousand dollars." Smith exhibited signs of an increasingly nervous demeanor.

Agent Markonni began a series of requests to search Smith's luggage and Smith persisted in refusing on the basis he "just [did not] think [he] should have to allow a search of his luggage." During this time, the agent confronted Smith with his knowledge of Smith's itinerary and his suspicion that the cash was leftover drug money from the purchase of drugs which the agent believed were in Smith's luggage. Agent Markonni gave Smith the Miranda warnings which Smith acknowledged that he understood. Subsequently, Agent Markonni again accused Smith of carrying drugs in his luggage and told him that if he did not consent to a search in Atlanta, he would be met by law enforcement officials and, if possible, drug dogs at his Tulsa destination. When Smith declined to consent, the agent told him that he was free to leave and then directed Smith's attention to the two officers who had witnessed their conversation.

While Smith waited in the gate area, Agent Markonni then retrieved Smith's suitcase from the airline by providing Smith's name and the last four digits of the baggage claim check number

garnered from his earlier inspection of Smith's ticket. The suitcase, previously described by Smith as brown Samsonite, was a silver Halliburton instead. The suitcase bore Smith's name and correct address. Smith acknowledged the suitcase as his and, after the agent read him his rights regarding the search of his personal property, asked to talk with a lawyer. Agent Markonni told Smith that he was free to leave, but that the suitcase would be detained so that a search warrant could be obtained to determine its contents. When the agent left to begin the process of search warrant application, the other two officers remained in the area to watch Smith to be certain that he boarded his plane to Tulsa, which he did.

Upon his sworn affidavit and oral statements, Agent Markonni obtained a search warrant from Judge Ed Brock of the Atlanta Municipal Court. The agent searched the suitcase which was found to contain one kilogram of a substance suspected to be cocaine. After a hearing the trial court granted Smith's motion to suppress the evidence found in the suitcase. The state appeals.

1. The state enumerates as error the trial court's grant of Smith's motion to suppress and raises various contentions in support of this general enumeration. The state first challenges the motion as defective on its face for failure to comply with Code Ann. § 27-313 (b). Also asserted is Smith's lack of standing to move to suppress evidence gained from the search. These contentions will not be considered on appeal as they were not raised in the trial court. *State v. Thomas,* 150 Ga. App. 170 (1) (257 SE2d 28) (1979).

2. The state next challenges the trial court's suppression of the evidence at issue, claiming an erroneous application of the controlling law to the evidence adduced at the hearing. The order sustaining Smith's motion stated that the proper scope, duration and intent of a permissible "Terry confrontation" had been exceeded when the interrogation had persisted to the point of harassment despite Smith's assertion of his right of privacy. Further, the proper scope of such confrontation was exceeded with the seizure of Smith's suitcase without his consent and over his objection. The trial court then found that the search warrant was based upon unlawfully obtained evidence. The state asserts that no "Terry confrontation" occurred, and that even if it did, the legality of the search warrant was not affected by it.

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .' There is no question in this case that [Smith] possessed this constitutional right of personal security as [he] walked through the [Atlanta] Airport. . . ." United States v. Mendenhall, 446 U. S. 544, 550 (100 SC

1870, 64 LE2d 497) (1980). This protection applies not only to persons, but also to their effects. "With rare exceptions the seizure of a person or his effects is deemed per se 'unreasonable' unless a warrant has first been obtained from a neutral magistrate upon a showing of probable cause." United States v. Place, 660 F2d 44, 47 (2d Cir. 1981), cert. granted, —— U. S. —— (102 SC 2901, 73 LE2d 1312) (1982). See Katz v. United States, 389 U. S. 347, 357 (88 SC 507, 19 LE2d 576) (1967). However, some curtailment of individual liberty may be justified upon a showing of less than probable cause where a balancing of the "public interest and the individual's right to personal security free from arbitrary interference by law officers" so warrants. United States v. Brignoni-Ponce, 422 U. S. 873, 878 (95 SC 2574, 45 LE2d 607) (1975). This narrow exception to the probable cause requirement was first carved out by the United States Supreme Court in Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), which permits a law enforcement official to stop an individual for the purpose of investigation even without probable cause when the officer is "possessed of sufficient specific articulable facts to justify a reasonable suspicion that the person stopped was engaged in unlawful activity." United States v. Place, supra at 48. "This court has held that 'articulable suspicion' is 'less than probable cause to make an arrest or conduct a search, but must be more than mere caprice or arbitrary harassment.' *Allen v. State,* 140 Ga. App. 828, 830 (232 SE2d 250) [(1976)]." *Radowick v. State,* 145 Ga. App. 231, 233 (244 SE2d 346) (1978).

At the time Agent Markonni initially accosted Smith, no record evidence suggests, nor does the state assert, the existence of probable cause to seize Smith or his effects. Therefore, the original encounter between the agent and Smith must be justified and governed by Terry v. Ohio, supra. "Drug cases are no different from any other cases." *State v. Johnson,* 246 Ga. 654, 655 (272 SE2d 321) (1980).

Agent Markonni testified at the suppression hearing that his initial reason for following Smith was to see what name was on his ticket "[b]ecause he was the only person who came in on the Fort Lauderdale flight that even aroused my suspicions." This, according to the agent, "was likely because of his conduct." From the transcript it is apparent that the agent measured Smith's conduct against the DEA "drug courier profile," a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics. See Reid v. Georgia, 448 U. S. 438 (100 SC 2752, 65 LE2d 890) (1980). Smith's "conduct" in this instance consisted of the fact that he arrived in Atlanta from a city known to be a major center for narcotics traffic. Additionally, Smith exhibited nervous behavior upon deplaning. At this point Smith was simply the only one on the

flight who piqued the agent's interest. The agent asserted that he followed Smith to find out what name was on his ticket. This he accomplished and then he called Smith's reservation call-back contact number. The hotel confirmed that Smith had checked in at 4:51 p. m. on June 10, 1981. From this the agent surmised that he had spent approximately nineteen hours in Fort Lauderdale.

In order for the "Terry confrontation" or "Terry stop" to have been valid, the foregoing information must have provided articulable facts leading to a reasonable suspicion of Smith's criminal conduct. Without such specific facts *articulable at the time of the stop,* the investigative "Terry confrontation" can not be justified. United States v. Ballard, 573 F2d 913 (2) (5th Cir. 1978). Use of the "drug courier profile" and an agent's own experience have been recognized as valid tools in detecting criminal activity. See *Berry v. State,* 163 Ga. App. 705 (1) (294 SE2d 562) (1982). However, as this court pointed out in *Berry,* while a reasonable investigative stop does not offend the Fourth Amendment, "[t]he reasonableness of a stop turns on the facts and circumstances of each case." Mendenhall, supra at 561. Such articulable facts and reasonable suspicion are not provided solely by Smith's arrival from a drug source city and apparently nervous behavior. There is nothing in the record to substantiate Agent Markonni's conclusion that Smith spent only one night in Fort Lauderdale, only that he spent one night at that hotel. In our view, Agent Markonni's decision to stop Smith was based more on the "inchoate and unparticularized suspicion or hunch" prohibited by Terry v. Ohio than on articulable facts leading to a reasonable suspicion.

Assuming arguendo that the "Terry confrontation" was permissible, did the actions of Agent Markonni overreach the minimal intrusion authorized by Terry and convert an otherwise legal investigatory stop to an illegal detention? See *Radowick,* supra at (3). The "Terry confrontation" is subject to strict boundaries regarding duration, intent, and scope. It has been described by this Court as "a brief stop, limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification, . . . and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop." *Radowick,* supra at 237; *Bowers v. State,* 151 Ga. App. 46 (258 SE2d 623) (1979). In the case sub judice, Agent Markonni's questioning should have ended when Smith's driver's license and ticket matched the name Smith provided to the agent, and he gave his reason for being in Fort Lauderdale as looking at an airplane, along with his denial that he was transporting illegal drugs. The agent's request that Smith submit to a search of his person was clearly unauthorized.

"When trying to establish that there was a voluntary consent after an illegal stop, the government has a much heavier burden to carry than when the consent is given after a permissible stop." United States v. Ballard, supra at 916. We refuse to permit the state to bootstrap the presence of a large amount of cash in Smith's boot as a bolster for probable cause to obtain the search warrant. The agent's observation of Smith's increasingly nervous behavior during the confrontation is not necessarily inconsistent with innocent behavior and, moreover, is understandable in light of the agent's persistent accusations. Additionally, the transcript of the testimony from the suppression hearing supports the inference of overreaching and harassment found by the trial court. *State v. Stone,* 147 Ga. App. 192 (248 SE2d 228) (1978). Credibility and weight of the evidence are matters for the trial judge on a motion to suppress, *Jones v. State,* 147 Ga. App. 779 (4) (250 SE2d 500) (1978), and the evidence supported the trial court's assessment that Agent Markonni's actions exceeded the "Terry confrontation" limitations and amounted to harassment.

"[W]hen airport security is not involved, every passenger who has luggage checked with an airline enjoys a reasonable expectation of privacy that the *contents* of that luggage will not be exposed in the absence of consent or a legally obtained warrant." United States v. Goldstein, 635 F2d 356, 361 (5th Cir. 1981). There is no question that Smith did not consent to the search of his suitcase; instead, the search, as noted by the trial court, was over Smith's objection. The information on which the state claims probable cause for the search warrant was gained through the overreaching condemned in *Radowick* and as such was illegally obtained and invalid. While this court realizes that the public interest in deterring drug trafficking through the use of commercial airlines is great, so is a citizen's right to privacy. "[O]ne [is not] shorn of his right to privacy when he disembarks from an airplane in Atlanta, Georgia." *Bowers,* supra at 54 (on motion for rehearing). The overreaching here exhibited will not be sanctioned by this court, and we affirm the order of the trial court suppressing the evidence at issue.

*Judgment affirmed. Deen, P. J., and Sognier, J., concur.*

DECIDED OCTOBER 13, 1982 —
REHEARING DENIED OCTOBER 27, 1982 —

*Robert E. Keller, District Attorney, Steven F. Lister, Wm. L. McKinnon, Jr., Assistant District Attorneys,* for appellant.
*John Echols, Bruce Maloy,* for appellee.