307 Ga. 59
FINAL COPY

S18G1546. MOBLEY v. THE STATE.

BLACKWELL, Justice.

After he was tried and convicted of two vehicular homicides, Victor Mobley appealed, claiming that the trial court erred when it denied his pretrial motion to suppress evidence of data that law enforcement officers retrieved without a warrant from an electronic data recording device on his vehicle. In denying the motion to suppress, the trial court had concluded that, whether or not the retrieval of the data was an unlawful search and seizure, the evidence was admissible in any event under the inevitable discovery doctrine. In Mobley v. State, 346 Ga. App. 641 (816 SE2d 769) (2018), a three-judge panel of the Court of Appeals affirmed, one judge reasoning that the retrieval of data was not a search and seizure at all, and two judges agreeing with the trial court that the inevitable discovery doctrine applied. We issued a writ of certiorari to review the decision of the Court of Appeals, and for the reasons

that follow, we conclude that the trial court erred when it denied the motion to suppress. The judgment of the Court of Appeals, therefore, is reversed.

1. On the afternoon of December 15, 2014, Mobley was driving a 2014 Dodge Charger on Flippen Road in Henry County. A 1999 Chevrolet Corvette pulled onto Flippen Road from a private driveway, and the Charger collided with it. Mobley survived the crash, but the two occupants of the Corvette did not. At first, the law enforcement officers who responded to the scene of the collision found no indication that Mobley had been driving too fast. Indeed, based on their preliminary assessment of the scene and their initial discussions with witnesses, the officers thought it likely that the driver of the Corvette had caused the collision simply by driving into the path of the Charger.

But before the vehicles were removed from the scene of the collision, Sergeant David Gagnon — a supervisor in the Traffic Division of the Henry County Police Department — directed officers to retrieve any available data from the airbag control modules

2

(ACM) on the Charger and Corvette.[1] Investigator Jason Hatcher entered the passenger compartments of both vehicles, attached a crash data retrieval (CDR) device to data ports in the cars, and used the CDR to download data from the ACMs. The data retrieved from the Charger indicated that, moments before the collision, Mobley was driving nearly 100 miles per hour. The officers subsequently cleared the scene and had the Charger and Corvette both towed to an impound lot for further investigation.

---

[1] The record shows that an ACM, also known as an "event data recorder" or "electronic control module," is an onboard electronic data recording device that is designed to preserve certain data about the operation of a vehicle in the moments preceding certain occurrences, including any event that results in the deployment of airbags. Although the precise data preserved varies from vehicle to vehicle, the data retrieved from the Charger in this case included the speed of the vehicle, the status of the brakes, the status of the brake switch, the time from maximum deceleration to impact, the time from impact to airbag deployment, the speed of the engine, the throttle position, the number of crankshaft revolutions per minute, the status of the driver's seatbelt, and a diagnostic indicator about the functioning of the ACM.

The record in this case also shows that the data recorded by an ACM upon the happening of some occurrences subsequently may be overwritten, but the data is permanently recorded — and cannot be overwritten — when the precipitating event is an airbag deployment. The collision on December 15, 2014, resulted in the deployment of airbags in both the Charger and the Corvette.

The next day, Investigator Bryan Thornton joined the team of officers investigating the collision.[2] He discussed the case with the officers who had responded to the crash, visited and personally inspected the scene of the collision, and then applied for a warrant to search the Charger and Corvette and to physically remove and seize the ACMs from both vehicles. When Investigator Thornton made his application for a warrant, he was aware that Investigator Hatcher already had retrieved the data from the ACMs and that the data indicated that the Charger had been traveling at an excessive rate of speed.[3] His application, however, did not rely on the data to establish probable cause for the seizure of the ACMs. A magistrate

---

[2] Investigator Thornton was off duty on the day of the collision.

[3] At the hearing on the motion to suppress, Investigator Thornton testified that he was aware that data already had been retrieved at the scene of the collision. And although he did not testify explicitly about his knowledge of the substance of that data at the time he applied for a warrant, he said that the data was the basis for the conclusion that Mobley committed vehicular homicide in the *first* degree (as opposed to some lesser offense or no offense at all). In the warrant application, Investigator Thornton represented that the ACMs likely contained evidence of vehicular homicide in the first degree. His testimony at the hearing implies, therefore, that he had a meaningful awareness of the substance of the data when he made the warrant application.

issued the warrant, officers executed the warrant at the impound lot, and the ACMs were removed from both vehicles. It appears, however, that no additional data was retrieved from the ACMs subsequent to the execution of the warrant.[4]

In June 2015, a Henry County grand jury indicted Mobley, charging him with two counts of vehicular homicide in the first degree, reckless driving, and speeding. Mobley later filed a motion pursuant to OCGA § 17-5-30 to suppress the evidence of the data retrieved without a warrant from the ACM in his Charger, alleging that the retrieval of data was an unreasonable search and seizure forbidden by the Fourth Amendment.[5] The trial court held an

---

[4] The warrant authorized the seizure of the ACMs but did not explicitly authorize any retrieval of data from the ACMs.

[5] Mobley also alleged that the retrieval of data was an unlawful search and seizure under Article I, Section I, Paragraph XIII of the Georgia Constitution of 1983. There are cases suggesting, however, that Paragraph XIII is coextensive with the Fourth Amendment and provides no greater protection against unreasonable searches and seizures. See, e.g., Wells v. State, 180 Ga. App. 133, 134 (2) (348 SE2d 681) (1986). Whether or not those cases are right, see Elliott v. State, 305 Ga. 179, 187-188 (II) (C) (824 SE2d 265) (2019), Mobley has made no argument based on constitutional text, context, or history that Paragraph XIII offers greater protection than the Fourth Amendment. Cf. Grady v. Unified Govt. of Athens-Clarke County, 289

5

evidentiary hearing on the motion in June 2017, and at that hearing, the prosecuting attorney presented the testimony of Sergeant Gagnon, Investigator Hatcher, and Investigator Thornton.

Following the presentation of evidence, the prosecuting attorney argued that the motion to suppress should be denied for several reasons. More specifically, she argued that:

- Mobley had no reasonable expectation of privacy with respect to the data, and for that reason, the retrieval of that data was not a search and seizure for purposes of the Fourth Amendment;

- Even if the retrieval of the data was a search and seizure, a warrant was unnecessary because the search was directed to an automobile;

- Exigent circumstances — namely, the possibility that the data could be lost or corrupted when the vehicles were towed away from the scene — permitted a warrantless search;

- Investigator Hatcher retrieved the data without a warrant in good faith reliance on his understanding that no warrant is required to retrieve data from an ACM at the scene of a serious crash; and

---

Ga. 726, 731 (2) (b) n.3 (715 SE2d 148) (2011). Accordingly, for the purposes of this opinion, we will treat Paragraph XIII and the Fourth Amendment as coextensive, and for the sake of simplicity, we will refer only to the Fourth Amendment as the basis for the motion to suppress.

6

- The subsequent issuance of a warrant to seize the ACMs made the discovery of the data inevitable.

On the day after the hearing, the trial court entered an order denying the motion to suppress. Without deciding whether the retrieval of data at the scene of the collision was a search and seizure that ordinarily would require a warrant, and without determining whether any established exception to the warrant requirement applied, the trial court concluded that the subsequent issuance of a warrant to seize the ACMs rendered the evidence admissible under the inevitable discovery exception to the exclusionary rule:

> The Court finds that it does not have to reach the decision on the appropriateness of the actions of the officers on the scene because a search warrant was obtained the next day. [Investigator] Thornton testified that he always seeks such a warrant in accidents involving fatalities. A review of the warrant application and supporting affidavit shows that neither the application nor the affidavit relied upon information obtained from the on-the-scene download. The Court finds that the data contained in the ACM would have certainly been available to law enforcement when the ACMs were properly removed from the vehicles pursuant to the search warrant[ ], and thus would have inevitably been discovered by investigators.

7

Mobley then stipulated to the relevant facts for purposes of a bench trial, and the trial court found him guilty on all counts. He was sentenced to concurrent terms of fifteen years — with seven years to be served in prison, followed by eight years on probation — on two counts of vehicular homicide in the first degree.[6]

Mobley appealed, challenging the denial of his motion to suppress. The Court of Appeals issued a split panel decision, rejecting the claim that the trial court erred when it denied the motion and affirming the judgment of conviction. Judge Mercier wrote the lead opinion, although she wrote only for herself. Judge Mercier concluded that the trial court properly denied the motion to suppress because the data retrieved from the ACM in the Charger was not of a sort in which Mobley could have a reasonable expectation of privacy. See Mobley, 346 Ga. App. at 646 (1). Noting that the data simply reflected the operation and movements of the Charger in the moments immediately preceding the collision, Judge

---

[6] The trial court merged the reckless driving and speeding with the vehicular homicides.

8

Mercier explained that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id. at 645 (1) (citation and punctuation omitted). Although Judge Mercier conceded that "an outside observer cannot ascertain the information regarding the use and functioning of a vehicle with the same level of precision as that captured by the ACM," she said that most of the information that could be gleaned from the data was, in fact, ascertainable by any observer, albeit with less precision:

> For example, a member of the public can observe a vehicle's approximate speed; observe whether a vehicle's brakes are being employed by seeing the vehicle slow down or stop or the brake lights come on, [or] by hearing the sounds of sudden braking; and observe whether the driver is wearing a seatbelt. There is no reasonable expectation of privacy in such information because an individual knowingly exposes such information to the public.

Id. at 646 (1).[7] Because Mobley had no reasonable expectation of privacy in the data, Judge Mercier concluded, its retrieval at the

---

[7] Judge Mercier distinguished the data retrieved from the ACM in this case from the data routinely stored on cell phones, Global Positioning Satellite

scene of the collision did not amount to a search and seizure and did not, therefore, implicate the Fourth Amendment. See id. at 644 (1).

Then-Chief Judge Dillard and Presiding Judge Doyle wrote separately, both resting their concurrences on the inevitable discovery exception to the exclusionary rule. Judge Dillard focused on the testimony of the officers at the hearing on the motion to suppress about the usual course of investigation in cases involving a fatality accident. Specifically, Judge Dillard pointed to evidence that the retrieval of data from ACMs is routine in such investigations, as well as the testimony of Investigator Thornton that, if data had not been retrieved from the ACM at the scene, he would have sought a warrant and obtained the same data later. See id. at 648-649 (Dillard, C. J., concurring specially).[8] Judge Doyle

(GPS) location data, and data reflecting vehicular operations and movements over much more substantial periods of time. See 346 Ga. App. at 646-647 (1). She acknowledged that obtaining those other sorts of data would or could implicate the Fourth Amendment, and she urged "law enforcement officers faced with an investigative need to obtain data from a vehicle's ACM to err on the side of caution by obtaining a search warrant before retrieving that information." Id. at 647 (1).

[8] Judge Dillard correctly noted — as we will discuss shortly—that

focused more on the warrant that was issued on the day following the collision, reasoning that it was obtained in the ordinary course of investigation, it did not rest on any information gleaned from the data retrieved without a warrant, and the data "inevitably would have been available to police pursuant to the warrant they later lawfully obtained." Id. at 652 (Doyle, P. J., concurring specially).

Mobley then filed a petition for a writ of certiorari. We granted his petition not only to consider the alternative grounds upon which the judges below concluded that the motion to suppress properly was denied, but also to decide whether OCGA § 17-5-30 categorically precludes the application of the inevitable discovery doctrine — or any other exception to the exclusionary rule — in Georgia. We now proceed to consider these issues in turn, addressing whether the

whether the retrieval of the data amounted to a search and seizure is not resolved simply by the conclusion that Mobley had no expectation of privacy in the data, inasmuch as a trespass upon private property may implicate the Fourth Amendment irrespective of reasonable expectations of privacy. See Mobley, 346 Ga. App. at 650 (Dillard, C. J., concurring specially). And although Judge Dillard did not attempt to definitively decide whether the retrieval of data in this case was a search and seizure, he — like Judge Mercier, see note 7 supra — urged officers in an abundance of caution to obtain warrants to retrieve ACM data. See id. at 651.

11

retrieval of data from the ACM on the Charger was a search and seizure that implicates the Fourth Amendment; if so, whether the retrieval of the data without a warrant was an *unreasonable* search and seizure forbidden by the Fourth Amendment; if so, whether OCGA § 17-5-30 forecloses consideration of any exception to the exclusionary rule; and if not, whether the inevitable discovery doctrine is applicable on the facts before us. Along the way, we also will consider whether any of the other grounds that the State urged in the trial court for denying the motion to suppress, but upon which none of the judges below relied, require a remand for further proceedings in the trial court.

2. To begin, we consider whether the retrieval of data from the ACM of the Charger at the scene of the collision was a search and seizure that implicates the Fourth Amendment. In pertinent part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U. S. Const. Amend. IV. The State argued in the trial court and the Court

12

of Appeals that the retrieval of data was not a search and seizure at all because Mobley had no reasonable expectation of privacy in the data. Although the trial court did not decide that question, Judge Mercier agreed that Mobley had no reasonable expectation of privacy in the data, and she concluded as a result that the motion to suppress properly was denied. In this Court, however, the State concedes that its argument below was based on a faulty premise. The State is right to make that concession.

For much of our history, the Fourth Amendment was understood to be concerned only with government trespasses upon the rights of individuals under the common law to be secure in their "persons, houses, papers, and effects." See United States v. Jones, 565 U. S. 400, 406 (II) (A) (132 SCt 945, 181 LE2d 911) (2012). See also Carpenter v. United States, 585 U. S. ___ (II) (A) (138 SCt 2206, 201 LE2d 507) (2018). Accordingly, to determine whether a government act amounted to a search, American courts traditionally asked whether the act was to "obtain[ ] information by physically intruding on a constitutionally protected area." Jones, 565 U. S. at

13

406 (II) (A) n.3. But "[m]ore recently, the [United States Supreme] Court has recognized that property rights are not the sole measure of Fourth Amendment violations." Carpenter, 585 U. S. at ___ (II) (A) (citation and punctuation omitted). Beginning in Katz v. United States, 389 U. S. 347 (88 SCt 507, 19 LE2d 576) (1967), the Supreme Court has held in a number of cases that government intrusion into a private sphere marked by a "reasonable expectation of privacy" generally qualifies as a search and, therefore, implicates the Fourth Amendment, irrespective of whether the intrusion amounts to a trespass upon private rights under the common law. See Carpenter, 585 U.S. at ___ (II) (A). See also Smith v. Maryland, 442 U. S. 735, 739 (II) (A) (99 SCt 2577, 61 LE2d 220) (1979); Katz, 389 U. S. at 360-361 (Harlan, J., concurring).

In this case, the State pressed an argument in the trial court and Court of Appeals premised on the misguided notion that "reasonable expectations of privacy" have supplanted private rights under the common law as the sole standard by which we determine whether a government act amounts to a search. But as the United

14

States Supreme Court has made perfectly clear, "the <u>Katz</u> reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." <u>Jones</u>, 565 U. S. at 409 (II) (A) (emphasis in original). See also id. at 414 (Sotomayor, J., concurring) ("<u>Katz</u>'s reasonable-expectation-of-privacy test augmented, but did not displace or diminish, the common-law trespassory test that preceded it."). If either standard is satisfied, the government act in question generally will amount to a search that implicates the Fourth Amendment. See id. at 409 (II) (A).

Although Mobley disputes the idea that he had no reasonable expectation of privacy in the data retrieved from the ACM on the Charger, we find it unnecessary to resolve that question.[9] To retrieve

---

[9] Even so, we note that it strikes us as a close question. As Judge Mercier acknowledged in her opinion below, although an observer independently could ascertain *some* of the information that readily can be gleaned from the data recorded on the ACM, an ordinary observer would not be able to ascertain *all* of that information, much less with anything approaching the precision reflected in the ACM data.

We also note that an ACM often will not be the only electronic data storage device on a vehicle, and the record does not disclose whether other devices sometimes may be integrated with ACMs or whether the same data ports used to access ACMs also can be used to access other devices. To the extent that other devices contain, for instance, GPS location data or data

the data, Investigator Hatcher entered the passenger compartment of the Charger and connected a CDR device with the ACM by way of an onboard data port. A personal motor vehicle is plainly among the "effects" with which the Fourth Amendment — as it historically was understood — is concerned, see United States v. Chadwick, 433 U. S. 1, 12 (4) (97 SCt 2476, 53 LE2d 538) (1977), and a physical intrusion into a personal motor vehicle for the purpose of obtaining information for a law enforcement investigation generally is a search for purposes of the Fourth Amendment under the traditional common law trespass standard. See Jones, 565 U. S. at 404 (II) (A) (installation of tracking device on private vehicle and subsequent use of device to monitor vehicle movements is a search). See also Florida v. Jardines, 569 U. S. 1, 5 (II) (133 SCt 1409, 185 LE2d 495) (2013). The retrieval of data without a warrant at the scene of the

---

shared between an onboard device and a cellular telephone, accessing data through an onboard data port may implicate the Fourth Amendment, regardless of whether anyone has a reasonable expectation of privacy in ACM data alone, and even in the absence of a trespass under the common law. See, e.g., Carpenter, 585 U. S. at ___ (III) (obtaining seven days of cell phone location data from wireless carrier is a search).

16

collision was a search and seizure that implicates the Fourth Amendment, regardless of any reasonable expectations of privacy.

3. We next consider whether the retrieval of data was an *unreasonable* search and seizure forbidden by the Fourth Amendment, and we conclude that it was. The Fourth Amendment evinces a "strong preference for searches conducted pursuant to a warrant." Illinois v. Gates, 462 U. S. 213, 236 (III) (103 SCt 2317, 76 LE2d 527) (1983). Indeed, the constitutional preference for warrants is so strong that searches and seizures without a warrant "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." State v. Slaughter, 252 Ga. 435, 436 (315 SE2d 865) (1984) (citation and punctuation omitted). See also Davis v. State, 262 Ga. 578, 580 (1) (422 SE2d 546) (1992). Here, Investigator Hatcher retrieved the data from the ACM on the Charger at the scene of the collision without a warrant, and the State has failed to identify any recognized exception to the warrant requirement that is applicable

to the facts that are established in the record.[10] Accordingly, the

retrieval of data from the ACM in the Charger at the scene of the

---

[10] In the trial court, the State argued two exceptions to the warrant requirement — the "automobile" exception and the "exigent circumstances" exception. It is quite clear, however, that the State failed to adduce evidence at the hearing on the motion to suppress sufficient to establish the predicates for application of either of those exceptions. The State bears the burden to show an exception to the warrant requirement, see Kennebrew v. State, 304 Ga. 406, 409 (1) (819 SE2d 37) (2018), and the record in this case forecloses both exceptions as a matter of law.

The automobile exception is inapplicable because the evidence is undisputed that, at the time Investigator Hatcher retrieved the data from the crashed Charger, the Charger not only was already in the custody and control of law enforcement officers but, more importantly, was not operable. See United States v. Delva, 922 F3d 1228, 1243 (IV) (A) (11th Cir. 2019) (automobile exception applies only when vehicle in question is "readily mobile"). See also State v. Lejeune, 276 Ga. 179, 182 (2) (576 SE2d 888) (2003) (automobile exception did not apply where suspect and his cohort did not have access to vehicle and officers impounded vehicle and had it towed away).

As for the exigent circumstances exception, the State argued that an immediate retrieval of data at the scene was necessary because of an imminent danger that the data would be lost or damaged. The evidence at the hearing on the motion to suppress, however, fails to establish any real exigency. There was *no* evidence that mere delay alone — the time it might take, for instance, to procure a warrant — would have caused the loss or corruption of any data. And although the officers said there was a danger of data corruption if the vehicle were removed from the scene, they clarified that the danger to which they referred was the risk that *some* data on the ACM could be overwritten with subsequent ignition starts — although the data concerning the crash in this case would not be overwritten, see note 1 supra — as well as a risk that the ACM itself could be damaged when removed from the vehicle. Consequently, there also was *no* evidence in this case that towing the vehicle from the scene would present a meaningful risk that the data pertaining to this crash would be lost or corrupted. See Davis, 262 Ga. at 583 (3) (prospective loss of evidence is exigent circumstance only if there is threat that evidence will be destroyed if search is not commenced right away). See also Crocker v.

18

crash without a warrant was an unreasonable search and seizure that violated the Fourth Amendment.

4. We turn now to the remedy for this violation of the Fourth Amendment. In a long line of decisions beginning with Weeks v. United States, 232 U.S. 383 (34 SCt 341, 58 LE 652) (1914), the United States Supreme Court has developed and refined an exclusionary rule as the federal constitutional remedy for Fourth Amendment violations. Although applicable at first only in federal courts, this exclusionary rule was made applicable in criminal proceedings in the state courts by the decision in Mapp v. Ohio, 367 U. S. 643 (81 SCt 1684, 6 LE2d 1081) (1961).

---

Beatty, 886 F3d 1132, 1136 (III) (A) (11th Cir. 2018) (exigent circumstances exception applies when there is danger of "imminent destruction of evidence," such that "a reasonable, experienced agent . . . believe[s] that [the] evidence might be destroyed before a warrant could be secured" (citation and punctuation omitted)).

    We recognize that neither the trial court nor the Court of Appeals opined on the applicability of these exceptions. But because the evidence presented at the hearing on the motion to suppress forecloses both exceptions as a matter of law, there is no reason for us to remand for consideration of these exceptions. We caution, however, that these exceptions perhaps could apply to the retrieval of ACM data at the scene of an accident in a case with different facts and a different record. Our decision today is based on the record before us.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." Illinois v. Krull, 480 U. S. 340, 347 (II) (A) (107 SCt 1160, 94 LE2d 364) (1987) (citations omitted). "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim," however, but instead "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." United States v. Calandra, 414 U. S. 338, 347 (III) (94 SCt 613, 38 LE2d 561) (1974). Consequently, the judicially developed exclusionary rule has been limited to "those situations in which its remedial purpose is effectively advanced," Krull, 480 U. S. at 347 (II) (A), and the courts have identified a number of exceptions to the usual rule of exclusion. At the urging of the State, the trial court and two judges of the Court of Appeals concluded that one such exception — the inevitable discovery exception — applies here and would allow the admission into evidence of the data retrieved from the Charger

20

at the scene of the collision, even if its retrieval violated the Fourth Amendment. Mobley says that this conclusion was error.

(a) Before we address whether the judges below were right to conclude that the inevitable discovery exception applies on the facts of this case, we must consider a threshold question. Mobley contends that OCGA § 17-5-30 is a statutory exclusionary rule that — unlike its federal counterpart, which developed and has been refined judicially — admits of no exceptions. According to Mobley, OCGA § 17-5-30 categorically precludes the recognition in Georgia of *any* exception to the exclusionary rule, and in support of this argument, he relies principally on our decision in Gary v. State, 262 Ga. 573 (422 SE2d 426) (1992). And because the inevitable discovery exception is not cognizable in Georgia, Mobley says, we need not decide whether the facts of this case fit within the exception. For the reasons that follow, we are unpersuaded.

As we have explained before, "[w]hen we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." Deal v. Coleman, 294 Ga. 170,

172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). "To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." Id. at 172-173 (1) (a) (citations and punctuation omitted). "The common and customary usages of the words are important, but so is their context." Zaldivar v. Prickett, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015) (citation and punctuation omitted). "For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." May v. State, 295 Ga. 388, 391-392 (761 SE2d 38) (2014) (citations omitted). Our consideration of OCGA § 17-5-30 begins with a brief discussion of the legal context in which the statute was adopted.

Before Mapp, there was no exclusionary rule in Georgia courts for unlawful searches and seizures. As early as 1897, this Court

22

squarely rejected an exclusionary rule as a matter of state law in

Williams v. State, 100 Ga. 511, 521 (28 SE 624) (1897), a decision

that we reaffirmed in Calhoun v. State, 144 Ga. 679, 682 (87 SE 893)

(1916). Although Georgia law provided other remedies for unlawful

searches and seizures, the exclusion of evidence in criminal

proceedings was not among them.[11] After Mapp was decided, the

Georgia courts promptly acknowledged the federal exclusionary

rule. See, e.g., Raif v. State, 109 Ga. App. 354, 361 (1) (136 SE2d

169) (1964). Our laws of criminal procedure, however, were not

designed to facilitate the application of such a rule. In particular,

the trial courts in Georgia had no procedural mechanism by which

they properly could entertain and resolve a motion to suppress

evidence obtained in violation of the Fourth Amendment prior to

trial. See generally Donald E. Wilkes, Jr., "A Most Deplorable

---

[11] See, e.g., Shafer v. State, 193 Ga. 748, 755 (2) (20 SE2d 34) (1942) (execution of search warrant issued without probable cause is a trespass); Smoot v. State, 160 Ga. 744, 744-745 (128 SE 909) (1925) (citizen may resist execution of unlawful search warrant); Walker v. Whittle, 83 Ga. App. 445, 450-451 (1) (64 SE2d 87) (1951) (aggrieved homeowner has right of action in tort for unlawful arrest inside home).

Paradox": Admitting Illegally Obtained Evidence in Georgia, 11 Ga. L. Rev. 105, 130-131 (1976). See also J. Robert Sparks, Search and Seizure, 1 GA. ST. B.J. 427, 429 (1965).

Five years after Mapp, the General Assembly enacted the Search and Seizure Act of 1966, "[a]n Act to provide procedures for searches and seizures and for suppression of evidence illegally seized." Ga. L. 1966, p. 567. Section 13 of the Act — now codified in the Criminal Procedure Code as OCGA § 17-5-30[12] — established a procedure for the filing, consideration, and resolution of motions to suppress. In pertinent part, it provides:

> (a) A defendant aggrieved by an unlawful search and seizure may move the court for the return of property, the possession of which is not otherwise unlawful, and to suppress as evidence anything so obtained on the grounds that:
> (1) The search and seizure without a warrant was illegal; or
> (2) The search and seizure with a warrant was illegal because the warrant is insufficient on its face, there was not probable cause for the issuance of the warrant, or the warrant was illegally executed.
> (b) The motion shall be in writing and state facts showing that the search and seizure were unlawful. The

---

[12] The statute has not been amended since its original enactment in 1966.

judge shall receive evidence out of the presence of the jury on any issue of fact necessary to determine the motion; the burden of proving that the search and seizure were lawful shall be on the state. If the motion is granted the property shall be restored, unless otherwise subject to lawful detention, and it shall not be admissible in evidence against the movant in any trial.

. . .

The text of OCGA § 17-5-30 was borrowed substantially from Federal Rule of Criminal Procedure 41 (e),[13] something of which our Court of Appeals took notice shortly after the enactment of the

---

[13] When OCGA § 17-5-30 was enacted, Rule 41 (e) provided in pertinent part:

> A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without a warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial. . . .

Fed. R. Crim. P. 41 (e) (1964). See also John H. Harper, Evidence—Illegally Obtained by State Officers, Inadmissible in Federal and State Courts, 23 Ga. B.J. 383, 386-387 (1961) (discussing Rule 41 (e) and the need for similar provision in Georgia in the wake of Mapp).

statute. See <u>Thomas v. State</u>, 118 Ga. App. 359, 360 (2) (163 SE2d 850) (1968). And that version of Rule 41 (e) was understood to be "no broader than the constitutional [exclusionary] rule" and not to amount to "a statutory expansion of the exclusionary rule."[14] <u>Calandra</u>, 414 U. S. at 348 (III) n.6 (citing <u>Alderman v. United States</u>, 394 U. S. 165 (89 SCt 961, 22 LE2d 176) (1969), and <u>Jones v. United States</u>, 362 U. S. 257 (80 SCt 725, 4 LE2d 697) (1960)).

Mobley urges that OCGA § 17-5-30 should be understood to absolutely and without exception require the suppression of any evidence obtained by way of any search and seizure that is described in paragraph (a) (1) or (a) (2) of the statute — a search without a warrant that is unlawful for any reason, a search pursuant to a warrant that is unlawful because "the warrant is insufficient on its face," a search pursuant to a warrant that is unlawful because "there was not probable cause for the issuance of the warrant," or a search

---

[14] We note that the inevitable discovery exception had been recognized in the federal courts — in which Rule 41 (e) was the law — before our General Assembly borrowed from Rule 41 (e) to enact OCGA § 17-5-30. See, e.g., <u>Wayne v. United States</u>, 318 F2d 205, 209 (3) (a) (D.C. Cir. 1963).

pursuant to a warrant that is "illegally executed" — irrespective of whether the federal constitutional exclusionary rule would require its suppression. Read without regard to its context, perhaps that would be the most reasonable understanding of OCGA § 17-5-30, although it is not the only way in which the statute reasonably could be understood.[15] But we do not endeavor to give meaning to statutes

---

[15] The statute provides that the circumstances enumerated in paragraphs (a) (1) and (a) (2) are "grounds" for "[a] defendant aggrieved by an unlawful search and seizure" to *file a motion* to suppress. Perhaps the statute could be understood to mean that those circumstances are, without more, also grounds for a court to *grant* such a motion, although the statute does not say so explicitly. But other statutory exclusionary rules are far less equivocal. See, e.g., OCGA §§ 16-11-67 ("No evidence obtained in a manner which violates any of the provisions of this part shall be admissible in any court of this state except to prove violations of this part."), 24-8-824 ("To make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury.").

Moreover, even without an appreciation of the broader context of OCGA § 17-5-30, it is not unreasonable to understand the provisions of subsection (a) in a more limited sense to mean just what they say — that the enumerated circumstances are merely "grounds" for the filing of a motion to suppress. After all, although a defendant aggrieved by a search and seizure reasonably can be made responsible for ascertaining whether the search and seizure was unlawful — and put to the burden of filing a motion to suppress on the ground that it was — the defendant commonly will be without knowledge of the sorts of circumstances that commonly form the basis for the established exceptions to the judicially developed exclusionary rule; it would, therefore, make little sense to limit the grounds upon which a motion properly can be filed by reference to those circumstances.

27

without consideration of their context. See <u>Zaldivar</u>, 297 Ga. at 591 (1).

The legal context of OCGA § 17-5-30 points to a different understanding. The Georgia courts consistently rejected an exclusionary rule for violations of the Fourth Amendment until <u>Mapp</u> left our courts with no choice but to recognize such a rule. The existing laws of criminal procedure, however, made no provision for a procedure by which the exclusionary rule could be applied before trial, a problem that was widely acknowledged in the contemporary legal scholarship. Within a short time, the General Assembly acted to adopt a law "to provide *procedures* for search and seizures and for the suppression of evidence," Ga. L. 1966, p. 567 (emphasis supplied), and in particular, to provide "procedures . . . for the suppression of evidence," the General Assembly borrowed from Federal Rule of Evidence 41 (e), a rule that was understood to confer no greater right to exclude evidence than the constitutional exclusionary rule. This context leads to the conclusion that OCGA § 17-5-30 is most naturally and reasonably understood to be merely a

28

procedural statute, establishing a mechanism for the application of an exclusionary rule, the scope and limits of which must be ascertained from the decisional law by which it developed.

Against this understanding of the statute, however, stands our decision in <u>Gary</u>. In that case, we were confronted with evidence obtained by way of a search pursuant to a warrant that was issued without probable cause. See <u>Gary</u>, 262 Ga. at 577. The Court of Appeals had held that the evidence nevertheless was admissible under an exception to the exclusionary rule for warrants issued without probable cause but executed by officers relying in good faith on the validity of the warrants, an exception that the United States Supreme Court had adopted in <u>United States v. Leon</u>, 468 U. S. 897 (104 SCt 3405, 82 LE2d 677) (1984). See <u>Gary</u>, 262 Ga. at 574.[16]

In <u>Gary</u>, we issued a writ of certiorari and reversed, holding that recognition of the <u>Leon</u> exception is foreclosed in Georgia by OCGA § 17-5-30. We began our analysis of the statute with the

---

[16] See also <u>State v. Gary</u>, 201 Ga. App. 556, 556 (411 SE2d 536) (1991).

notion that it was enacted "'to provide for searches and seizures and for suppression of evidence illegally seized,'"[17] id., and we then said (without further analysis) that the adoption of the statute reflected the determination of the General Assembly to "impose greater requirements upon its law enforcement officers than that required by the United States Constitution, as interpreted by the U. S. Supreme Court." Id. at 574-575. After reciting the relevant (in the context of that case) provisions of OCGA § 17-5-30 (a) (2) and (b), we summarily concluded: "OCGA § 17-5-30 is the legislature's unequivocal expression of its desire that evidence seized by means of a warrant that is not supported by probable cause be suppressed." Id. at 575. From this broad understanding of the statute, we then reasoned that the statute more specifically forecloses the application in Georgia of the Leon exception. Id. at 575-576.[18] We gave no

---

[17] Notably, Gary misquoted the preamble to the Search and Seizure Act of 1966, omitting the word "procedures." Compare Ga. L. 1966, p. 567 ("An Act to provide *procedures* for searches and seizures and for suppression of evidence illegally seized . . . .").

[18] In a footnote, we said that "[t]he Leon good-faith exception has been

30

rejected by the appellate courts of other states which have statutory exclusionary rules." Gary, 262 Ga. at 575 n.7. The cases cited in the Gary footnote to support this proposition, however, hardly support the notion that exceptions to the exclusionary rule are inconsistent with OCGA § 17-5-30. Indeed, each of the cited cases from other jurisdictions either involved a statute requiring suppression in far more unequivocal terms than OCGA § 17-5-30 or the application of an exclusionary rule developed judicially under a state constitution or statute. See, e.g., State v. Garcia, 547 S2d 628, 630 (Fla. 1989) (rejecting Leon exception in face of statute providing that, "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of the information would be in violation of this chapter"(citation and punctuation omitted)); Commonwealth v. Upton, 476 NE2d 548, 551-553 (1), 554 (2) (Mass. 1985) (relying on exclusionary rule adopted judicially in Commonwealth v. Monosson, 221 NE2d 220 (Mass. 1966), for violations of statute prescribing necessary form and content of applications for search warrants); State v. Carter, 370 SE2d 553, 555 (N.C. 1988) (construing exclusionary rule recognized judicially for violations of state constitution as inconsistent with Leon exception); Davis v. State, 831 SW2d 426, 441 (Tex. App. 1992) (rejecting Leon exception as incompatible with Tex. Code Crim. Proc. art. 38.23 (a), which provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case").

Remarkably, Gary did *not* cite State v. Marsala, 579 A2d 58 (Conn. 1990), a case in which the Connecticut Supreme Court — two years before Gary was decided — considered whether the good faith exception was compatible with a state statute governing motions to suppress. Like OCGA § 17-5-30, the Connecticut statute was adopted in the wake of Mapp — in part to address the lack of any procedural mechanism in Connecticut for addressing motions to suppress before trial — and was based in significant part on former Federal Rule of Criminal Procedure 41 (e). See *Marsala*, 579 A2d at 60-62 (I). Considering the context of the statute, the Connecticut Supreme Court concluded that it was "procedural rather than substantive and, therefore, do[es] not define the extent of the exclusionary rule under Connecticut law." Id. at 61 (I).

31

consideration in <u>Gary</u> to the legal context of OCGA § 17-5-30, including the background law of Georgia at the time of its enactment and the understanding of Rule 41 (e), from which its provisions were substantially borrowed. Because <u>Gary</u> failed to consider this important context, we conclude that its broader reasoning is unsound, and its understanding of OCGA § 17-5-30 is simply incorrect.

The question, therefore, is what to do with <u>Gary</u>. In the nearly 30 years since that decision, this Court has relied on it in only three cases to reject an exception to the exclusionary rule, all involving claims that evidence obtained by officers relying in good faith on the validity of a search warrant should be admitted, notwithstanding the unlawfulness of the search and seizure.[19] See <u>Beck v. State</u>, 283 Ga. 352, 353 (1) (658 SE2d 577) (2008) (officers relied on search warrant issued by person not authorized to issue warrants); <u>Harper v. State</u>, 283 Ga. 102, 107 (2) (657 SE2d 213) (2008) (officers relied

---

[19] In a handful of other cases, we have cited <u>Gary</u> in passing or for other propositions. In none of those other cases have we relied on <u>Gary</u> and its construction of OCGA § 17-5-30 to reject an exception to the exclusionary rule.

32

on search warrant issued without probable cause); <u>Miley v. State</u>, 279 Ga. 420, 422 (614 SE2d 744) (2005) (officers relied on search warrant issued without probable cause). We never have extended <u>Gary</u> and its construction of OCGA § 17-5-30 to foreclose application of any other established exception to the exclusionary rule. To the contrary, we and the Court of Appeals have applied other exceptions in a number of cases without mention of <u>Gary</u>. See, e.g., <u>Teal v. State</u>, 282 Ga. 319, 325 (2) (647 SE2d 15) (2007) (inevitable discovery exception); <u>Taylor v. State</u>, 274 Ga. 269, 274-275 (3) (553 SE2d 598) (2001) (inevitable discovery exception); <u>Stephens v. State</u>, 346 Ga. App. 686, 691-693 (2) (816 SE2d 748) (2018) (independent source exception); <u>Pinkney v. State</u>, 332 Ga. App. 727, 731 (2) (774 SE2d 770) (2015) (independent source exception); <u>Ansley v. State</u>, 325 Ga. App. 226, 231 (1) (b) (750 SE2d 484) (2013) (independent source exception); <u>Schweitzer v. State</u>, 319 Ga. App. 837, 840 (738 SE2d 669) (2013) (inevitable discovery exception); <u>Williams v. State</u>, 308 Ga. App. 464, 468 (2) (708 SE2d 32) (2011) (inevitable discovery exception); <u>Cunningham v. State</u>, 284 Ga. App. 739, 742 (644 SE2d

878) (2007) (inevitable discovery exception). And before this case, no case appears to have ever suggested that OCGA § 17-5-30 could be understood to foreclose the inevitable discovery or any other exception, although we must concede in fairness to Mobley that a logical extension of the broad reasoning of <u>Gary</u> — that OCGA § 17-5-30 is a statutory exclusionary rule that admits of no exceptions — would seemingly lead to that conclusion.[20]

---

[20] In <u>Harvey v. State</u>, 266 Ga. 671 (469 SE2d 176) (1996), this Court was confronted with a motion to suppress evidence obtained in a search incident to arrest, where the arrest was premised on the reliance of an officer in good faith on the existence of a bench warrant. The officer had been told that the bench warrant was outstanding and valid, but in fact, it had been recalled prior to the arrest. See id. at 671. The trial court denied the motion to suppress, the Court of Appeals affirmed, and after issuing a writ of certiorari, this Court affirmed. We did so by acknowledging that <u>Gary</u> foreclosed the application of the <u>Leon</u> exception, see id. at 672, but we then re-characterized the issue presented as whether the officer had probable cause to believe that the accused had committed a crime, so as to authorize an arrest without a warrant (rather than the good faith reliance of the officer on the existence of a warrant). See id. And we held that his belief in the existence of the bench warrant gave the officer probable cause. See id. at 672-673. The analysis in <u>Harvey</u> seems strained, especially since a bench warrant issued for a failure to appear in court is no ground for believing that the subject of the bench warrant has committed any crime (other than the crime for which he already was arrested and for which he subsequently failed to appear in court). The author of <u>Gary</u> dissented in <u>Harvey</u>, suggesting that the <u>Harvey</u> decision "amount[ed] to a sub silentio overruling of <u>Gary</u>." Id. at 675 (Benham, C. J., dissenting). We agree that <u>Harvey</u> could be fairly understood to imply a retreat from the broad reasoning of <u>Gary</u>. We note, however, that under our view of OCGA § 17-5-30, the <u>Harvey</u> court likely would have reached the same result but without the need to re-characterize the issue as it did.

Gary involved the admission of evidence obtained by way of a search conducted by officers relying in good faith on the validity of a search warrant issued without probable cause, and the three cases in which we have relied on Gary all involved officers relying in good faith on the validity of search warrants. Whether the holdings of Gary and its progeny should be squarely overruled is a question that would require a consideration of the doctrine of stare decisis, see State v. Jackson, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010), but that is not a question that we must answer to resolve this case. This case does not involve good faith reliance on the validity of a search warrant, and we never have relied on the broader reasoning of Gary to foreclose consideration of an exception to the exclusionary rule in any other context, including with respect to the inevitable discovery exception. Today, we disavow the unsound reasoning of Gary, hold that it does not extend to any context other than the reliance of an officer in good faith upon the validity of a search warrant, and conclude that, in all other contexts, OCGA § 17-5-30 means what it most naturally and reasonably is understood in context to mean —

it establishes a procedure for applying the exclusionary rule but does not itself require the suppression of any evidence. It does not, therefore, categorically foreclose the application of any other exception to the exclusionary rule.[21]

(b) We turn at last to consider whether the inevitable discovery exception applies on the facts of this case, and we conclude that it does not. This Court has explained that, for the inevitable discovery exception to apply,

> there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct.

Taylor v. State, 274 Ga. 269, 274-275 (3) (553 SE2d 598) (2001) (citation and punctuation omitted), disapproved in part on other

---

[21] Whether stare decisis compels the retention of the particular holding in Gary that OCGA § 17-5-30 forecloses application of the Leon exception, notwithstanding the unsound reasoning from which that holding followed, is a question that will have to await a case involving the reliance of an officer in good faith on the validity of a search warrant.

grounds in State v. Chulpayev, 296 Ga. 764, 783 (3) (b) (770 SE2d 808) (2015).[22] See also Teal v. State, 282 Ga. 319, 325 (2) (647 SE2d 15) (2007). In this case, the State urges that, if Investigator Hatcher had not retrieved the ACM data from the Charger at the scene of the collision, the data would have been discovered in any event pursuant to a search warrant, as illustrated by the search warrant that Investigator Thornton obtained on the day after the crash.

The State is right that a search warrant issued upon probable cause may be a "lawful means" to discover evidence. See Teal, 282 Ga. at 326 (2). See also United States v. Delva, 922 F3d 1228, 1245-1246 (IV) (B) (11th Cir. 2019). And for the purposes of this opinion, we accept that the investigating officers had the requisite probable cause to obtain a warrant even before Investigator Hatcher retrieved the data from the Charger at the scene of the collision. The record in this case, however, does not show that the officers were "actively pursu[ing]" a search warrant at the time Investigator

---

[22] In Taylor, we borrowed this standard from the United States Court of Appeals for the Eleventh Circuit. See United States v. Terzado-Madruga, 897 F2d 1099, 1114 (11th Cir. 1990).

Hatcher retrieved the data without a warrant. Absent proof that the officers were actively pursuing a warrant at that point in time, the mere fact that Investigator Thornton actually obtained a warrant on the following day is not enough to bring this case within the inevitable discovery exception. See United States v. Satterfield, 743 F2d 827, 846 (IV) (B) (11th Cir. 1984). Cf. Delva, 922 F3d at 1245 (IV) (B) ("Here, in addition to obtaining a warrant to search the Mercedes later that same day, the Agents were actively pursuing that warrant *before* they initially searched the Mercedes." (Emphasis supplied)). Indeed, "[b]ecause a valid search warrant nearly always can be obtained after a search has occurred," allowing law enforcement to use a warrant from after-the-fact to justify an earlier search would threaten to vitiate the warrant requirement. Satterfield, 743 F2d at 846 (IV) (B). Cf. United States v. Johnson, 777 F3d 1270, 1276 (III) (A) (11th Cir. 2015).

There is no evidence that any of the investigating officers applied for a warrant, were preparing an application for a warrant, or even were contemplating a warrant before Investigator Hatcher

retrieved the data. Nor is there evidence that the Henry County Police Department has a policy, standard operating procedure, or consistent practice that leads officers to always or even routinely obtain search warrants for ACM data in the investigation of fatality crashes. See Davis, 262 Ga. at 583 (4) ("The state has not shown that a warrant would have been sought as part of the inevitable, routine procedure of the Douglas County Sheriff's Department [in these circumstances]."). To the contrary, the officers in this case testified that the most common practice in such investigations is to retrieve ACM data at the scene of a crash *without* a warrant. Not one of the officers suggested that they usually obtain warrants in cases like this one.

In its order denying the motion to suppress, the trial court concluded that an application for a warrant was inevitable, a conclusion based entirely on its finding that Investigator Thornton "always seeks such a warrant in accidents involving fatalities." Investigator Thornton, however, was off duty on the day of the collision, and there is no evidence that his involvement in the case

39

was even contemplated until the next day. That a particular officer always seeks a search warrant in similar circumstances cannot logically show that a warrant was inevitable at a point in time prior to that officer becoming involved in the case. Equally important, Investigator Thornton did not *actually* testify that he always obtains *warrants* in fatality crash investigations. To the contrary, he said that he always retrieves *ACM data* in such investigations, most commonly without a warrant at the scene of the crash. Investigator Thornton testified that, if ACM data could not be retrieved at the scene, he would seek a warrant, but that hardly suggests that warrants always or usually are sought, considering that the routine practice is to retrieve data at the scene without a warrant.[23] The finding of the trial court that Investigator Thornton always seeks a

---

[23] On the day after the collision, Investigator Thornton sought a warrant to remove and seize the ACMs from both vehicles, but he did not explain at the hearing on the motion to suppress *why* he had done so. It could not have been to retrieve data from the ACMs, considering that he knew that the data already had been retrieved, and after the warrant was executed, no further effort was made to retrieve data from the ACMs. Perhaps he sought the warrant simply to ensure the preservation of the data in its original form pending resolution of a prosecution that he already knew was likely to follow from the investigation of the crash.

warrant in cases like this one is clearly erroneous. See State v. Rosenbaum, 305 Ga. 442, 449 (2) (826 SE2d 18) (2019) (when this Court reviews a ruling on a motion to suppress, we defer to the factual findings of the trial court unless clearly erroneous).

The State has failed to lay an evidentiary foundation for the application of the inevitable discovery exception in this case. And the State has failed to identify any other established exception to the exclusionary rule that is applicable to the facts as shown by the record in this case.[24] Accordingly, the usual rule of exclusion holds, and the trial court should have granted the motion to suppress. The

---

[24] At the suppression hearing in the trial court, the prosecuting attorney argued that the good faith exception to the exclusionary rule that was recognized in Davis v. United States, 564 U.S. 229 (131 SCt 2419, 180 LE2d 285) (2011), is applicable in this case. To begin, we note that the Davis good faith exception is distinct from the Leon good faith exception and is not, therefore, foreclosed by the specific holding of Gary. Even so, the Davis exception does not apply in this case. The Davis exception only applies to "searches conducted in objectively reasonable reliance on binding appellate precedent." 564 U.S. at 232. Here, the record reflects that Investigator Hatcher, Sergeant Gagnon, and Investigator Thornton sincerely believed that they did not need a warrant to download ACM data at the scene of a serious crash, a belief that was based on advice that they received in the course of their law enforcement training, as well as legal advice that the Henry County Police Department apparently received at some point from an assistant district attorney. It appears that they were not well advised. Even so, reliance on training and the advice of a prosecuting attorney does not show that the officer reasonably relied on "binding appellate precedent."

judgment of the Court of Appeals, affirming the decision of the trial court, is reversed.

_Judgment reversed. All the Justices concur, except Melton, C. J., who concurs in judgment only._

DECIDED OCTOBER 21, 2019.

Certiorari to the Court of Appeals of Georgia — 346 Ga. App. 641.

_Brandon A. Bullard, James C. Bonner, Jr., Margaret E. Bullard_, for appellant.

_Darius T. Pattillo, District Attorney, Sharon L. Hopkins, Assistant District Attorney_, for appellee.

_Sean J. Young, Kosha S. Tucker, Nathan F. Wessler, Jennifer S. Granick, Riana Pfefferkorn_, amici curiae.